IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,387

STATE OF KANSAS,
*Appellee*,

v.

TIMOTHY C. BOETTGER,
*Appellant*.

SYLLABUS BY THE COURT

1.

The freedom of speech referred to in the First Amendment to the United States Constitution does not include a freedom to disregard restrictions on certain well-defined and narrowly limited categories of speech that the government may regulate and, in some circumstances, punish. A true threat falls within one category of speech the government may punish.

2.

True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not intend to commit violence.

3.

The portion of K.S.A. 2018 Supp. 21-5415(a)(1) allowing for a conviction if a threat of violence is made in reckless disregard for causing fear is unconstitutionally overbroad because it punishes conduct that may be constitutionally protected under some circumstances.

1

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 23, 2017. Appeal from the Douglas District Court; RICHARD M. SMITH, judge. Opinion filed October 25, 2019. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed.

*Clayton J. Perkins*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kate Duncan Butler*, assistant district attorney, argued the cause, and *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.:  The First Amendment to the United States Constitution prohibits the government from abridging our freedom of speech. But that freedom of speech is not without limits. The United States Supreme Court has recognized certain well-defined and narrowly limited categories of speech that the government may restrict and even criminally punish. One such category is that of a true threat. This appeal raises questions about what constitutes a true threat and, more specifically, whether the only way to make a true threat is to actually intend to cause fear. Timothy C. Boettger raises these questions by challenging the constitutionality of a provision in the Kansas criminal threat statute, K.S.A. 2018 Supp. 21-5415(a)(1), that allows for a criminal conviction if a person makes a threat in reckless disregard of causing fear. We hold this reckless disregard provision is unconstitutionally overbroad, and we reverse Boettger's conviction because it is based solely on that unconstitutional provision.

FACTUAL AND PROCEDURAL BACKGROUND

A jury convicted Boettger of one count of criminal threat for statements he made to Cody Bonham. Boettger frequented the convenience store where Bonham worked and often spoke with Bonham and another employee, Neil Iles.

On the night of the incident, Boettger came into the store and bought a cup of coffee. He spoke to Iles for a few minutes near the cash register. He told Iles he was upset because he had found his daughter's dog in a ditch. The dog had died from a gunshot wound, and Boettger was angry the sheriff's department had not investigated. Iles recalled Boettger saying "these people . . . might find themselves dead in a ditch somewhere." Iles thought Boettger was referring to the shooter. Based on past conversations, Iles knew Boettger often had an intense way of speaking and a tendency to get upset. Iles thought Boettger was no more upset than he had been in other situations, and Iles perceived Boettger's reaction as a general complaint about the sheriff's department's inaction.

Boettger walked out of the store but soon came back. At that time, Bonham was stocking a shelf in the aisle nearest to the door. Boettger and Bonham were well-acquainted, having visited between 600 and 800 times over the course of the previous four years. Boettger also knew Bonham's family. He had dated Bonham's aunt and he had known Bonham's father since high school. Boettger knew Bonham's father was a detective in the Douglas County Sheriff's Office.

Like Iles, Bonham knew Boettger had an intense way of speaking about certain subjects. But on this occasion, Bonham felt Boettger was unusually intense as he told Bonham about being upset because of what happened to his daughter's dog and the sheriff's department's failure to investigate. Boettger clenched his fists, and he was visibly

3

shaking. Bonham further testified that Boettger spoke as he approached, saying, "You're the man I'm looking for." According to Bonham, Boettger continued by saying "he had some friends up in the Paseo area in Kansas City that don't mess around, and that I was going to end up finding my dad in a ditch." Boettger ended the conversation by saying, "'You remember that.'" Iles saw Boettger speaking with Bonham but could not hear their conversation.

After Boettger left, Iles noticed that Bonham appeared to be distraught. Bonham relayed what happened and called his father to tell him about the incident. Bonham drafted an email to record the details of his conversation with Boettger and called the police to report the incident. At trial, Boettger admitted he knew Bonham's father was a member of the sheriff's department but denied threatening to harm him. He asserted Bonham was mistaken about what he said. Boettger denied mentioning friends from the Paseo area, saying instead that he had referred to friends in North Kansas City. Boettger generally claimed he had no intent to threaten anyone and did not mean Bonham or his family any harm. He felt he was on good terms with the family based on his past interactions and relationship with Bonham's father and aunt.

The district court instructed the jury a conviction required finding that Boettger "threatened to commit violence and communicated the threat with reckless disregard of the risk of causing fear in Cody Bonham." The jury convicted Boettger of one count of reckless criminal threat under K.S.A. 2016 Supp. 21-5415(a)(1). Boettger timely appealed, raising five arguments. The Court of Appeals rejected his arguments and affirmed his conviction and sentence. See *State v. Boettger*, No. 115,387, 2017 WL 2709790, at *1 (Kan. App. 2017) (unpublished opinion).

Boettger timely petitioned for review, raising the same five arguments he had made before the Court of Appeals. This court granted review but only on three of the

4

issues: (1) whether the reckless form of criminal threat under K.S.A. 2018 Supp. 21-5415(a)(1) is unconstitutionally overbroad; (2) whether the reckless threat provision is unconstitutionally vague; and (3) whether the jury instruction on the elements of reckless criminal threat was clearly erroneous.

ANALYSIS

The three issues before this court all relate to Kansas' criminal threat statute, K.S.A. 2018 Supp. 21-5415(a). There, the Legislature defined "criminal threat" to include a threat to "(1) [c]ommit violence communicated with intent to place another in fear . . . or in reckless disregard of the risk of causing such fear." Boettger's arguments are specific to the last portion of this definition—a threat made in reckless disregard of the risk of causing fear.

In his first two arguments, Boettger asserts the reckless criminal threat provision is both unconstitutionally overbroad and vague. Issues about the constitutionality of a statute present questions of law over which this court has unlimited review. *State v. Whitesell*, 270 Kan. 259, 268, 13 P.3d 887 (2000) (overbreadth and vagueness). Boettger carries the burden to establish the statute is unconstitutional. See *State v. Williams*, 299 Kan. 911, 920, 329 P.3d 400 (2014).

Before addressing Boettger's arguments, we must consider whether he has preserved his constitutional challenges for appellate review. Generally, a party cannot raise an issue for the first time on appeal, and Boettger did not present the arguments to the district court. See *Williams*, 299 Kan. at 929. Even so, Boettger argued to the Court of Appeals that both his overbreadth and vagueness challenges fell within recognized exceptions to the preservation rule. He specifically pointed to exceptions allowing a party to raise a constitutional argument for the first time on appeal if it presents a question of

5

law or if consideration of it is necessary to prevent the denial of a fundamental right. See *State v. Herbel*, 296 Kan. 1101, 1116, 299 P.3d 292 (2013). The Court of Appeals accepted those justifications. See *Boettger*, 2017 WL 2709790, at *2, 5. It also concluded Boettger had standing to raise the argument that K.S.A. 2018 Supp. 21-5415(a)(1) makes unlawful constitutionally protected conduct even though he has not asserted that he himself was engaged in a protected activity. See *Williams*, 299 Kan. at 919 (holding a litigant has standing to assert overbreadth challenge that seeks to protect First Amendment rights of third parties).

The State did not cross-petition for review to ask us to consider either of these holdings. When a party does not cross-petition for review on an issue decided adversely to that party by the Court of Appeals, we deem it as settled on review. *Ullery v. Othick*, 304 Kan. 405, 415, 372 P.3d 1135 (2016) (Court of Appeals holding not included in petition or cross-petition for review not before this court); see Supreme Court Rule 8.03 (h)(1) (2018 Kan. S. Ct. R. 56).

We, therefore, consider his constitutional challenges to the statute.

ISSUE 1: *K.S.A. 2018 Supp. 21-5415(a)(1) is unconstitutionally overbroad*.

Boettger first argues the reckless form of criminal threat criminalizes speech protected under the First Amendment to the United States Constitution and is therefore overbroad. "[A]n overbroad statute makes conduct punishable which under some circumstances is constitutionally protected." *Whitesell*, 270 Kan. 259, Syl. ¶ 6. A party arguing a statute is overbroad must show "(1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing" constitutional applications of the law from unconstitutional ones. 270 Kan. 259, Syl. ¶ 6; see *Dissmeyer v. State*, 292 Kan. 37, 40-41, 249 P.3d 444 (2011); see also, e.g., *Houston v. Hill*, 482

6

U.S. 451, 459, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987) (A statute "that make[s] unlawful a substantial amount of constitutionally protected conduct may be held facially invalid".); *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) (A statute may be overbroad "if in its reach it prohibits constitutionally protected conduct.").

To determine whether the reckless disregard provision is overbroad, we must consider the scope of speech protected by the First Amendment.

### 1.1 *First Amendment protections*

The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This free speech protection extends to state laws through the Equal Protection Clause of the Fourteenth Amendment. See *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95-96, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit expression of an idea simply because society itself finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).

"From 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). These limited classes consist of "well-defined and narrowly limited" speech or expressive conduct that has "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). Classes of speech

7

the government may punish include obscenity, defamation, fighting words, incitement to imminent breach of the peace, and "true threats." See *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); *R.A.V.*, 505 U.S. at 383. The United States Supreme Court has "recognized that 'the freedom of speech' referred to by the First Amendment does not include a freedom to disregard these traditional limitations." 505 U.S. at 383.

Even though governmental restrictions on these categories of speech may be constitutional, they can also go too far and result in an infringement of First Amendment rights. The United States Supreme Court dealt with such a situation in *R.A.V.*, 505 U.S. 377.

R.A.V., a minor, was convicted of violating St. Paul, Minnesota's Bias-Motivated Crime Ordinance. The ordinance prohibited displaying a symbol if one knows or has reason to know it "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." The United States Supreme Court accepted the Minnesota Supreme Court's determination that the ordinance applied only to fighting words, as defined in *Chaplinsky*, 315 U.S. at 572 ("Fighting words" are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."). And *Chaplinsky* held that the category of fighting words is one classification that "'is not in any proper sense communication of information or opinion safeguarded by the Constitution.'" 315 U.S. at 572 (quoting *Cantwell v. State of Connecticut*, 310 U.S. 296, 310, 60 S. Ct. 900, 84 L. Ed. 1213 [1940]). Even so, the Court held the ordinance violated the First Amendment because it regulated the content of the speech—that is, it prohibited speech "solely on the basis of the subjects the speech addresses." *R.A.V.*, 505 U.S. at 381.

8

The *R.A.V.* Court recognized that some United States Supreme Court decisions could be read as holding that fighting words were categorically unprotected by the First Amendment. 505 U.S. at 383; see, e.g., *Chaplinsky*, 315 U.S. at 571-72 ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."). But the Court noted that these statements must be read in context and, in context, they were meant only as a "shorthand." 505 U.S. at 383. That shorthand, the Court explained, should not be taken to mean that all prohibitions against fighting words, obscenity, or libel are constitutional because the Court's holding must be limited to the specific circumstances of a case. Outside those circumstances, a restriction targeting one of those categories of speech may be unconstitutional and will be if it discriminates based on content. Thus, for example, "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." 505 U.S. at 383-84. The *R.A.V.* Court recognized that "the prohibition against content discrimination that we assert the First Amendment requires is not absolute," and it then discussed several exceptions. 505 U.S. at 387-90. Ultimately, the discrimination does not violate the Constitution if "the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." 505 U.S. at 390.

1.2 *True-threat doctrine*

The United States Supreme Court has explained that the same tension can arise when the government attempts to criminalize "true threats." In *Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969), the United States Supreme Court thus held that "a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." In that case, an 18-year-old protesting at a public rally after having received his draft

9

classification was charged with knowingly and willfully threatening the President of the United States. The young man had said, "'If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.'" 394 U.S. at 706. The United States Supreme Court explained the statement was political hyperbole and not a "true 'threat.'" 394 U.S. at 708.

The true-threat doctrine mentioned in *Watts* is the focus of this case. The United States Supreme Court more fully explored the doctrine in *Black*, 538 U.S. 343. There, the Court again used the term "true threat" to differentiate between protected and unprotected speech, defining the term in a sentence that has become the focus of much of Boettger's and the State's arguments. It stated: "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359. The speaker need not intend to commit violence. "Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" 538 U.S. at 360.

### 1.3 *Boettger's contentions—matters of first impression*

Boettger essentially contends that under *Virginia v. Black's* definition of "true threat" set out above, he can be found guilty of making a true threat—one the First Amendment does not protect—only if he possessed the subjective intent to both (1) utter threatening words and (2) cause another to fear the possibility of violence. He further argues K.S.A. 2018 Supp. 21-5415(a)(1) is overbroad because it encompasses more than a true threat and could punish someone for uttering distasteful words that are not a true threat by punishing someone who speaks "in reckless disregard of the risk of causing such fear" of violence.

10

This court has never considered whether a conviction for recklessly making a threat can be a true threat or instead violates the First Amendment. Although not asking the question in this way, in 2001 (two years before the decision in *Black*), a panel of the Court of Appeals rejected arguments that a previous version of the criminal threat statute violated the First Amendment because it was overbroad and vague. *State v. Cope*, 29 Kan. App. 2d 481, 29 P.3d 974 (2001), *rev'd on other grounds* 273 Kan. 642, 44 P.3d 1224 (2002). The statute as it read in 2001 allowed a conviction based on someone making a threat in reckless disregard of causing an evacuation of a building, place of assembly, or facility of transportation. See 29 Kan. App. 2d at 483-84.

The *Cope* panel reached its ruling, in part, by relying on *State v. Bourke*, 237 Neb. 121, 122, 464 N.W.2d 805 (1991), *disapproved on other grounds* by *State v. Warner*, 290 Neb. 954, 863 N.W.2d 196 (2015). In turn, the State now cites *Bourke* in support of its argument that Kansas' current statute is constitutional. But *Bourke* provides limited guidance.

There, the Nebraska Supreme Court considered the constitutionality of a statute very similar to Kansas' 2001 version of the criminal threat statute. A criminal defendant argued at trial that the reckless disregard provision was both unconstitutionally vague and overbroad. The Nebraska trial court found the reckless disregard provision of the Nebraska statute unconstitutionally vague. On appeal from that ruling the question before the Nebraska Supreme Court was thus vagueness—not overbreadth. See 237 Neb. at 122. As a result, the Nebraska decision did not support that portion of *Cope* dealing with the overbreadth issue, only the panel's vagueness analysis. The *Cope* panel also cited several Kansas cases dealing generally with an issue about overbreadth. But the precedential value of these cases was limited because none of them dealt with the criminal threat statute or discussed the true-threat doctrine. The State attempts to mitigate this by pointing out that post-*Black* the Nebraska Supreme Court reaffirmed *Bourke*. See *State v.*

11

*Nelson*, 274 Neb. 304, 311, 739 N.W.2d 199 (2007). Again, however, the Nebraska Supreme Court in *Bourke* considered an issue related to whether the statute was vague, not whether it was overbroad. And it did not discuss the true-threat doctrine. As a result, these authorities provide no guidance on whether a recklessly made statement of violence may constitutionally constitute a true threat. And neither does *Cope*. We thus find no Kansas authority deciding whether someone who utters a threat of violence in reckless disregard of causing fear has uttered a true threat.

Nor has the United States Supreme Court explicitly decided the question. According to Justice Thomas, the lack of a decision by that Court on the issue "throws everyone from appellate judges to everyday Facebook users into a state of uncertainty." *Elonis v. United States*, 575 U.S. __, 135 S. Ct. 2001, 2018, 192 L. Ed. 2d 1 (2015) (Thomas, J., dissenting). Indeed, as we will detail, post-*Black* courts determining the type of intent necessary to qualify as a true threat have reached differing results. A more detailed discussion of the *Virginia v. Black* decision places those differing views in context.

1.4  Virginia v. Black

Barry Black and others were separately convicted of violating a Virginia statute that made it illegal to burn a cross "with the intent of intimidating any person or group of persons." Va. Code Ann. § 18.2-423 (1996). The statute added that "[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons." Va. Code Ann. § 18.2-423. The Virginia Supreme Court held the statute was facially unconstitutional for two reasons:  (1) It "selectively chooses only cross burning because of its distinctive message" and was "analytically indistinguishable from the ordinance found unconstitutional in *R.A.V.*, [505 U.S. 377]", and (2) the prima facie evidence provision of the statute "enhanced [the] probability of prosecution" and was

12

thus overbroad because it "chills the expression of protected speech." *Black v. Commonwealth of Virginia*, 262 Va. 764, 774, 777, 553 S.E.2d 738 (2001), *aff'd in part, vacated in part* 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

The case was appealed and reached the United States Supreme Court, where the nine justices wrote five opinions. A majority of the Court—formed through multiple opinions—disagreed with the Virginia Supreme Court's first holding that the statute was indistinguishable from the ordinance found unconstitutional in *R.A.V.* A plurality of the Court—consisting of Justice O'Connor, who authored the opinion, joined by Chief Justice Rehnquist, Justice Stevens, and Justice Breyer—reviewed "cross burning's long and pernicious history as a signal of impending violence." 538 U.S. at 363. Because of that history, Justice O'Connor wrote:  "The First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation." 538 U.S. at 363. She categorized the cross burning as a true threat, as had the Virginia Supreme Court.

Justice O'Connor, however, disagreed with the Virginia Court's application of *R.A.V.* to hold that the cross-burning statute was unconstitutional because it discriminated on the basis of content and viewpoint. *Black*, 262 Va. at 771-76. She concluded the Virginia statute fell within an exception discussed in *R.A.V.* under which "the First Amendment permits content discrimination 'based on the very reasons why the particular class of speech at issue . . . is proscribable.'" *Black*, 538 U.S. at 362 (quoting *R.A.V.*, 505 U.S. at 393). That very reason, according to Justice O'Connor, was because the statute prohibited a true threat. And it did not single out "'disfavored topics'" or differentiate conduct based on the "victim's race, gender, or religion, or because of the victim's 'political affiliation, union membership, or homosexuality.'" 538 U.S. at 362.

13

Justice Stevens concurred, writing that an intent to intimidate "qualifies as the kind of threat that is unprotected by the First Amendment." 538 U.S. at 368 (Stevens, J., concurring). And Justice Scalia agreed that "a State may, without infringing the First Amendment, prohibit cross burning carried out with the intent to intimidate." 528 U.S. at 368 (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part); see also 538 U.S. at 388 (Thomas, J., dissenting) ("Although I agree with the majority's conclusion that it is constitutionally permissible to 'ban . . . cross burning carried out with the intent to intimidate,' [citation omitted] I believe that the majority errs in imputing an expressive component to the activity in question[.]").

The remaining justices disagreed. In an opinion written by Justice Souter joined by Justices Kennedy and Ginsburg, they agreed with the Virginia Supreme Court that the statute was unconstitutional and could not be saved by any *R.A.V.* exception. 538 U.S. at 380 (Souter, J., concurring in the judgment in part and dissenting in part). But the Court's differences of opinion did not end there.

Justice O'Connor, having disagreed with the Virginia Supreme Court's first holding, turned to its second holding—that the statute was overbroad because of the prima facie evidence provision providing that "[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons." Va. Code Ann. § 18.2-423. The plurality observed that cross burning can occur for reasons other than intimidation. "[S]ometimes the cross burning is a statement of ideology, a symbol of group solidarity. It is a ritual used at Klan gatherings, and it is used to represent the Klan itself. Thus, '[b]urning a cross at a political rally would almost certainly be protected expression.'" *Black*, 538 U.S. at 365-66 (quoting *R.A.V.*, 505 U.S. at 402 n.4 [White, J., concurring in judgment], and citing *Brandenburg v. Ohio*, 395 U.S. 444, 445, 89 S. Ct. 1827, 23 L. Ed. 2d 430 [1969]). The plurality opinion concluded: "The prima facie evidence provision in this case ignores all of the contextual factors that are necessary to

14

decide whether a particular cross burning is intended to intimidate. The First Amendment does not permit such a shortcut." 538 U.S. at 367. Although Justice Souter did not join this portion of the plurality opinion, he expressed similar concerns. See 538 U.S. at 384-87.

Justices Scalia and Thomas neither joined in this portion of the plurality opinion nor expressed similar concerns. Instead, they disagreed with the plurality's conclusion the prima facie evidence provision made the statute unconstitutional. 538 U.S. at 368-79.

1.5  Black's *guidance*

*Black* did not directly address whether the First Amendment tolerates a conviction for making a threat even though there was no intent to cause fear. Even so, the decision explains the intent necessary to have a true threat prosecuted without violating the First Amendment's protections. The explanation begins with the passage defining a "true threat." Again, the Court said:

> "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. See *Watts v. United States*, [394 U.S.] at 708 ('political hyberbole' is not a true threat); *R.A.V. v. City of St. Paul*, 505 U.S., at 388. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" 538 U.S. at 359-60.

A majority of the Court (the four members of the plurality, plus Justice Scalia) explicitly agreed on this statement. See 538 U.S. at 368 (Scalia, J., joining Parts I-III of Justice O'Connor's opinion).

15

Here, in rejecting Boettger's arguments, the panel seemingly focused on the second portion of the first sentence in which the Court referred to "an intent to commit an act of unlawful violence to a particular individual or group of individuals." It held the *Black* Court's use of the word "'intent' is a shorthand method for referring to the need for a *mens rea* higher than accidental or negligent conduct." *Boettger*, 2017 WL 2709790, at *4. The panel also concluded that the *Black* Court "did not rule on what level of mens rea is necessary in a criminal threat statute," in part because the Virginia statute required subjective intent and the "constitutional necessity of that provision was never at issue." *Boettger*, 2017 WL 2709790, at *4.

Although the panel did not cite cases from other jurisdictions, several courts have reached similar conclusions. See *United States v. Clemens*, 738 F.3d 1, 10 (1st Cir. 2013) (interpreting *Black*'s reference to "those statements where the 'speaker means to communicate a serious expression of an intent to commit an act of unlawful violence'" as "only requir[ing] the speaker to 'intend to make the communication,' not the threat." [quoting *Black*, 538 U.S. at 359; *United States v. Elonis*, 730 F.3d 321, 329 (3d Cir. 2013)]), *rev'd and remanded* 575 U.S. ___, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015); *United States v. Martinez*, 736 F.3d 981, 986-87 (11th Cir. 2013) ("*Black* did not import a subjective-intent analysis into the true threats doctrine. Rather, *Black* was primarily a case about the overbreadth of a specific statute—not whether all threats are determined by a subjective or objective analysis in the abstract."), *vacated and remanded* 575 U.S. ___, 135 S. Ct. 2798 (2015); *United States v. Jeffries*, 692 F.3d 473, 479-80 (6th Cir. 2012) ("[*Black*] says nothing about imposing a subjective standard on other threat-prohibiting statutes, and indeed had no occasion to do so: the Virginia law itself required subjective 'intent.' The problem in *Black* thus did not turn on subjective versus objective standards for construing threats. It turned on overbreadth—that the statute lacked any standard at all."); *United States v. White*, 670 F.3d 498, 508 (4th Cir. 2012) ("A careful

16

reading of the requirements of § 875[c], together with the definition from *Black,* does not, in our opinion, lead to the conclusion that *Black* introduced a specific-intent-to-threaten requirement into § 875[c] and thus overruled our circuit's jurisprudence, as well as the jurisprudence of most other circuits, which find § 875[c] to be a general intent crime and therefore require application of an objective test in determining whether a true threat was transmitted."); *United States v. Nicklas*, 713 F.3d 435, 439-40 (8th Cir. 2013) (adopting Sixth Circuit's reasoning in *Jeffries*, 692 F.3d at 479-80); *State v. Taupier*, 330 Conn. 149, 170-71, 193 A.3d 1 (2018), *cert. denied* 139 S. Ct. 1188 (2019) (*Black* does "not support the proposition a speaker constitutionally may be punished *only* when he has a specific intent to intimidate"; "[T]he plurality in *Black* was focused more on the Virginia cross burning statute's failure to differentiate between different levels of intent than on the specific *mens rea* that is constitutionally required before a person may be punished for threatening speech.").

We disagree with these courts' reading of *Black*. Many of these decisions follow the reasoning of *Elonis*, 730 F.3d 321, which the United States Supreme Court reversed. *Elonis v. United States*, 575 U.S. ___, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015). Plus, there are several other reasons we do not dismiss the guidance provided by what we view as a plain reading of *Black*.

Much of that guidance can be found in the sentence defining a true threat: "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. The sentence has ambiguity. But the interpretation by the panel and other courts taking the same view ignores the first part of the sentence—that the speaker must "mean" to communicate a serious expression of an intent to commit violence. As a transitive verb, "mean" is defined as: "To have as a purpose or an intention; intend; To design, intend, or destine for a certain purpose or

17

end." American Heritage Dictionary of the English Language 1088-89 (5th ed. 2011); see Webster's Third New Int'l Dictionary 1398 (1993) ("to have in the mind [especially] as a purpose or intention"; "to have an intended purpose").

Given this, we agree with the Tenth Circuit Court of Appeals' holding that this sentence "requir[es] more than a purpose to communicate just the threatening words. It is requiring that the speaker want the recipient to believe that the speaker intends to act violently." *United States v. Heineman*, 767 F.3d 970, 978 (10th Cir. 2014). The Tenth Circuit found more support for this position in a later sentence in the same paragraph in which Justice O'Connor applied the true-threat definition to intimidation: "'Intimidation *in the constitutionally proscribable sense of the word* is a type of true threat, where a speaker directs a threat to a person or group of persons with the *intent of placing the victim in fear of bodily harm or death*.'" 767 F.3d at 978 (quoting *Black*, 538 U.S. at 360, and adding emphases). Based on these passages, the Tenth Circuit "read *Black* as establishing that a defendant can be constitutionally convicted of making a true threat only if the defendant *intended* the recipient of the threat to feel threatened." 767 F.3d at 978.

Responding to those courts that read *Black* as only conveying that the speaker had to intend to utter the words, the Tenth Circuit observed that the *Black* Court had made clear the speaker uttering the threat need not actually intend to commit violence. *Heineman*, 767 F.3d at 978. The Tenth Circuit concluded these statements by the Court would be meaningless if a true threat was not defined to require the intent to threaten:

> "The proposition that the speaker need not intend to carry out the threat is a helpful
> qualification if there is a requirement that the defendant intend the victim to feel
> threatened. . . . But no such qualification is called for if the preceding sentence means that
> the only requisite mens rea is that the defendant 'knowingly says the words.' . . . Once it is
> established that the sole requisite intent is to say the (threatening) words, no reasonable

18

person (juror) would then need to be informed that the defendant need not intend to carry out the threat. If there is no requirement that the defendant intend the victim to feel threatened, it would be bizarre to argue that the defendant must still intend to carry out the threat." 767 F.3d at 980-81.

Likewise, the Ninth Circuit Court of Appeals determined that a "natural reading" of *Black*'s definition of true threats "embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to *threaten* the victim." *United States v. Cassel*, 408 F.3d 622, 631 (9th Cir. 2005); see *United States v. Bagdasarian*, 652 F.3d 1113, 1116-18 (9th Cir. 2011). The *Cassel* court examined each of the separate opinions in *Black* and concluded that "eight Justices agreed that intent to intimidate is necessary and that the government must prove it in order to secure a conviction." 408 F.3d at 632 (citing *Black*, 538 U.S. at 359-60, 364-65, 367 [O'Connor, J., plurality]; 538 U.S. at 368 [Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part]; 538 U.S. at 385, 387 [Souter, J., concurring in the judgment in part and dissenting in part]); see also Schauer, *Intentions, Conventions, and the First Amendment*, 55 Sup. Ct. Rev. 197, 217 (2003) ("[I]t is plain that . . . the *Black* majority . . . believed that the First Amendment imposed upon Virginia a requirement that the threatener have specifically intended to intimidate."); Gilbert, *Mocking George:  Political Satire as 'True Threat' in the Age of Global Terrorism*, 58 U. Miami L. Rev. 843, 883-84 (2004) ("[C]ross burning is proscribable as a true threat where it is done with the intention of intimidating. Where, however, cross burning is not done to intimidate . . . its use is protected under the First Amendment, even where the effect of the cross burning is to intimidate."); cf. Rothman, *Freedom of Speech and True Threats*, 25 Harv. J.L. & Pub. Pol'y 283, 317-18 (2001) (arguing, before *Black*, for a subjective intent requirement, and observing that "First Amendment law often requires proof of a specific state of mind before finding a speaker liable or allowing a criminal conviction of the speaker").

Further, although the panel and other courts are correct in stating that *Black* was dealing with a statute that clearly required the cross burning to occur "with the intent of intimidating," the *Black* plurality, in the context of its overbreadth analysis, discussed what had to be proven in order for there to be a true threat. This discussion became more general than the specific statute before the Court. Significantly, Justice O'Connor stated: "The prima facie evidence provision in this case ignores all of the contextual factors that are necessary to decide whether a particular cross burning is intended to intimidate. The First Amendment does not permit such a shortcut." 538 U.S. at 367.

This language, in particular, suggests the members of the Court joining Justice O'Connor's opinion went beyond recognizing that intent was part of the statutory elements of the Virginia statute. They also recognized that intent to intimidate must exist in order to distinguish cross burning as a means of protected expression under the First Amendment from cross burning as a threat of impending violence unprotected by the First Amendment. See 538 U.S. at 368 (Stevens, J., concurring) (An intent to intimidate "qualifies as the kind of threat that is unprotected by the First Amendment.").

In other words, the plurality's overbreadth analysis was "predicated on the understanding that the First Amendment requires the speaker to intend to place the recipient in fear." *Heineman*, 767 F.3d at 978. And, as the *Cassel* court concluded:

> "The Court's insistence on intent to threaten as the *sine qua non* of a constitutionally punishable threat is especially clear from its ultimate holding that the Virginia statute was unconstitutional precisely because the element of intent was effectively eliminated by the statute's provision rendering any burning of a cross on the property of another 'prima facie evidence of an intent to intimidate.'" 408 F.3d at 631.

The Tenth Circuit also pointed out that Justice O'Connor wrote that the prima facie evidence provision "'does not distinguish between a cross burning done with the purpose of creating anger or resentment and a cross burning done with the purpose of threatening or intimidating a victim.'" *Black*, 538 U.S. at 366. The Tenth Circuit then asked: "But how could that be a First Amendment problem if the First Amendment is indifferent to whether the speaker had an intent to threaten?" *Heineman*, 767 F.3d at 978-79. It then answered: "The First Amendment overbreadth doctrine does not say simply that laws restricting speech should not prohibit too much speech. It says that laws restricting speech should not prohibit too much speech *that is protected by the First Amendment*." 767 F.3d at 979. And Justice O'Connor's discussion makes clear "'the element of intent [is] the determinative factor separating protected expression from unprotected criminal behavior.'" *Cassel*, 408 F.3d at 632 (referring to statements in *Black*, 538 U.S. at 365, that "'same act' 'may mean that a person is engaging in constitutionally proscribable intimidation [or] only that the person is engaged in core political speech'" and "'a burning cross is not always intended to intimidate'").

Although Justice O'Connor's opinion only represented the position of four Justices, Justice Souter's opinion made similar points when discussing the prima facie evidence provision. He likewise noted that cross burning can be consistent with an intent to intimidate or with an "intent to make an ideological statement free of any aim to threaten." He referred to the intent to intimidate as "proscribable and punishable intent" and the other as permissible intent. *Black*, 538 U.S. at 385-86 (Souter, J., concurring in the judgment in part and dissenting in part). Both Justice O'Connor's and Justice Souter's opinions highlight that, if the First Amendment did not impose a specific intent requirement, "Virginia's statutory presumption was superfluous to the requirements of the Constitution, and thus incapable of being unconstitutional in the way that the majority understood it." Schauer, 55 Sup. Ct. Rev. at 217.

21

We conclude a majority of the *Black* Court determined an intent to intimidate was constitutionally, not just statutorily, required. "Intimidation *in the constitutionally proscribable sense of the word* is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear* of bodily harm or death." (Emphases added.) *Black*, 538 U.S. at 360.

Further, although *Black* addressed intimidation, its analysis applies equally to K.S.A. 2018 Supp. 21-5415(a)(1). The statute draws no distinction based on the means through which fear is caused. The plain meaning of the conduct prohibited by K.S.A. 2018 Supp. 21-5415(a)(1)—causing fear—is indistinguishable from the intimidation provision at issue in *Black*.

1.6 *Recklessness*

The Court of Appeals panel, however, rejected Boettger's argument that the *Black* Court's various references to "intent" eliminated the possibility of a true threat being made with a reckless disregard for causing fear of violence. The panel concluded *Black* left open the possibility of the culpable mental state being recklessness. The panel then turned to a discussion of Kansas law that defines "recklessness" as a culpable mental state that means a person who acts recklessly is *aware* of the nature of his or her conduct. 2017 WL 2709790, at *4-5 (quoting K.S.A. 2016 Supp. 21-5202[a], [b], [j] and citing Kansas cases). These Kansas authorities, according to the panel, aligned with the following statement from Justice Alito's concurring and dissenting opinion in *Elonis*, 135 S. Ct. 2001: "Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway." 135 S. Ct. at 2015 (Alito, J., concurring in part and dissenting in part).

The panel held: "Recklessness is sufficient *mens rea* to separate wrongful conduct from otherwise innocent conduct. Accordingly, we find that K.S.A. 2016 Supp. 21-5415(a)(1) does not criminalize constitutionally protected conduct by criminalizing threats to commit violence communicated in reckless disregard of the risk of causing fear in another." *Boettger*, 2017 WL 2709790, at *5.

We do not quarrel with the panel's conclusion that recklessness can differentiate criminal conduct from innocent conduct. But that does not answer whether the statute violates the First Amendment by punishing protected speech. And while Justice Alito argues recklessness satisfies the First Amendment, we have trouble squaring that conclusion with *Black* and *Elonis*.

In *Elonis,* Anthony Douglas Elonis had used social media to post self-styled rap lyrics containing graphically violent language. In the posts he wrote disclaimers saying the lyrics were "fictitious" and not intended to depict real persons. He also stated he was exercising his First Amendment rights. These posts led him to be charged with five counts of violating 18 U.S.C. § 875(c), which makes it a federal crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another." The statute did not set out a required mental state. At trial, Elonis requested a jury instruction that the Government had to prove that he intended to communicate a threat. The trial court rejected this argument and instead instructed the jury under the standard of whether "'a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual.'" 135 S. Ct. at 2007. The United States Supreme Court held this instruction was erroneous. 135 S. Ct. at 2012.

23

The Court applied a rule of statutory construction providing that the "'mere omission from a criminal enactment of any mention of criminal intent' should not be read 'as dispensing with it.'" 135 S. Ct. at 2009 (quoting *Morissette v. United States*, 342 U.S. 246, 250, 72 S. Ct. 240, 96 L. Ed. 288 [1952]). Instead, the Court would read into the statute "'only that *mens rea* which is necessary to separate wrongful conduct from "otherwise innocent conduct."'" 135 S. Ct. at 2010. And, in the context of the threat statute at issue, "'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication. . . . The mental state requirement must therefore apply to the fact that the communication contains a threat." 135 S. Ct. at 2011. The majority found error because the jury instruction imposed a negligence standard. It noted the court had "'long been reluctant to infer that a negligence standard was intended in criminal statutes'" because its focus on what a reasonable person would perceive was "inconsistent with 'the conventional requirement for criminal conduct—awareness of some wrongdoing.'" 135 S. Ct. at 2011.

The *Elonis* majority stopped short of answering the question before us about whether a statute must require subjective intent to survive a First Amendment attack. It noted that during oral argument Elonis' attorney had contended that a reckless mental state would not be sufficient. But because the parties had not briefed the question, the majority refused to address it. And it specifically stated it was not addressing any First Amendment issues. 135 S. Ct. at 2012.

Justice Alito took the majority to task for not answering whether reckless conduct could make a true theat. He later expressed his view that recklessness should suffice and that applying a reckless mens rea does not violate the First Amendment. 135 S. Ct. at 2013-16 (Alito, J., concurring in part and dissenting in part). His discussion focused on how the recklessness standard applied to Elonis, who had "made sure his wife saw his posts" and, in context, who could blame her for being fearful because "[t]hreats of

24

violence and intimidation are among the most favored weapons of domestic abusers, and the rise of social media has only made those tactics more commonplace." 135 S. Ct. at 2017 (Alito, J., concurring in part and dissenting in part). This context is readily distinguishable from the facts here, as well as those in *Black* and *Watts*.

Justice Alito then recognized and dismissed the possibility of a First Amendment issue:

"It can be argued that § 875(c), if not limited to threats made with the intent to harm, will chill statements that do not qualify as true threats, *e.g.,* statements that may be literally threatening but are plainly not meant to be taken seriously. We have sometimes cautioned that it is necessary to 'exten[d] a measure of strategic protection' to otherwise unprotected false statements of fact in order to ensure enough '"breathing space"' for protected speech. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963)). A similar argument might be made with respect to threats. But we have also held that the law provides adequate breathing space when it requires proof that false statements were made with reckless disregard of their falsity. See *New York Times,* 376 U.S., at 279-280 (civil liability); *Garrison*, 379 U.S., at 74-75 (criminal liability). Requiring proof of recklessness is similarly sufficient here." 135 S. Ct. at 2017 (Alito, J., concurring in part and dissenting in part).

At least two state courts have agreed with Justice Alito's view and others have recognized that recklessness may be a sufficient mens rea for a true threat. See *State v. Taupier*, 330 Conn. 149, 170-71, 193 A.3d 1 (2018), *cert. denied* 139 S. Ct. 1188 (2019) (collecting some post-*Black* cases and holding recklessness standard constitutional in a true-threat context); *Major v. State*, 301 Ga. 147, 150-51, 800 S.E.2d 348 (2017) (upholding recklessness standard post-*Black*); see also *Commonwealth v. Knox*, 190 A.3d 1146, 1156 (Pa. 2018), *cert. denied* 139 S. Ct. 1547 (2019) (collecting some post-*Black*

25

cases and noting an open question existed about whether recklessness standard can be applied in a true-threat context).

Our reading of *Black* differs, however, and is reflected in Justice Sotomayor's opinion in *Perez v. Florida*, 580 U.S. ___, 137 S. Ct. 853, 855, 197 L. Ed. 2d 480 (2017) (Sotomayor, J., concurring in denial of petition for writ of certiorari):

> "Together, *Watts* and *Black* make clear that to sustain a threat conviction without encroaching upon the First Amendment, States must prove more than the mere utterance of threatening words—*some* level of intent is required. And these two cases strongly suggest that it is not enough that a reasonable person might have understood the words as a threat—a jury must find that the speaker actually intended to convey a threat." 137 S. Ct. at 855.

As we have discussed, we, too, read *Black* as holding that the speaker must actually intend to convey a threat. Acting with an awareness that words may be seen as a threat leaves open the possibility that one is merely uttering protected political speech, even though aware some might hear a threat. Boettger offers examples.

Boettger first argues the protester in *Watts* could have been convicted under the Kansas statute. The protester communicated he would shoot the president; he thus made a threat. See K.S.A. 2018 Supp. 21-5111(ff) (defining "threat"). And he was aware of the risk of causing fear but continued anyway. See K.S.A. 2018 Supp. 21-5202(j) (defining "reckless"). As another example, Boettger poses the situation of a Black Lives Matter protester repeating the lyrics of a well-known police protest song while standing near police officers. He quotes the lyrics as a threat to "'[t]ak[e] out a cop or two.' . . . N.W.A., Fuck tha Police, on Straight Outta Compton (Ruthless/Priority 1989)." Even if the protester did not intend to threaten the police, Boettger argues "[a] person in that situation runs a real risk of a conviction for reckless threat under Kansas' law, despite acting in

protest by performing a controversial work of art." Finally, he suggests burning a "cross on private property within the view of a public roadway and other houses, where locals had stopped to watch" as part of a political rally would be an activity about which "the perpetrators would be conscious that it is seen as a threat, and would be acting in disregard of substantial and unjustifiable risk of causing fear." Such an act could be punishable under Kansas law, he argues, even if the protester intended politically protected speech on private property and did not intend to cause fear of violence.

We find these examples persuasive illustrations of ways in which K.S.A. 2018 Supp. 21-5415(a)(1) potentially criminalizes speech protected under the First Amendment.

### 1.7 *Summary*

*Black* found specific intent was necessary to convict under the Virginia cross-burning statute at issue in that case. See 538 U.S. at 360. The Court stated "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 360. It strains the plain meaning of the Court's language to conclude that "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" are not made "with the intent of placing the [particular individual or group of individuals] in fear of bodily harm or death." *Black*, 538 U.S. at 359-60. A person who "*means* to communicate a *serious* expression of an *intent* to commit an act of *unlawful* violence" is aware of the illegality of the violence he or she purportedly *intends* to commit and makes a *serious* expression of that intent, which he or she *meant* to communicate. (Emphasis added.) See *Black*, 538 U.S. at 360. This definition conveys that the conduct is intentional.

27

Under *Black*, the portion of K.S.A. 2018 Supp. 21-5415(a)(1) allowing for a conviction if a threat of violence is made in reckless disregard for causing fear causes the statute to be unconstitutionally overbroad because it can apply to statements made without the intent to cause fear of violence. See K.S.A. 2018 Supp. 21-5202(h) and (j) (defining "intentionally" and "recklessly" in Kansas criminal statutes). The provision significantly targets protected activity. And its language provides no basis for distinguishing circumstances where the speech is constitutionally protected from those where the speech does not warrant protection under the First Amendment.

Boettger's conviction for reckless criminal threat must be reversed because it was based solely on the unconstitutional provision. See *Whitesell*, 270 Kan. 259, Syl. ¶ 6 (stating test for overbreadth).

ISSUES 2 and 3: *Our holding renders these issues moot*.

Boettger also argued K.S.A. 2018 Supp. 21-5415(a)(1) was unconstitutionally vague. And he alternatively contended his conviction should be overturned on another basis by arguing the jury instruction for reckless criminal threat was clearly erroneous. We need not reach these issues, however, because we have already granted Boettger the relief he seeks by reversing his conviction.

CONCLUSION

We find the reckless criminal threat provision of K.S.A. 2018 Supp. 21-5415(a)(1) unconstitutionally overbroad. For that reason, we reverse Boettger's conviction, which is based solely on that provision, and vacate his sentence.

28

Judgment of the Court of Appeals is reversed. Judgment of the district court is reversed.

JOHNSON, J., not participating.