NOT DESIGNATED FOR PUBLICATION

No. 123,356

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CARLTON WAYNE SOLTON JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed October 1, 2021. Affirmed.

*Carlton Solton Jr.*, appellant pro se.

*Crystal French*, assistant county attorney, *Jeff Ebel*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., CLINE, J., and BURGESS, S.J.

PER CURIAM: Carlton Wayne Solton Jr. appeals his conviction for criminal threat. After he was convicted, the Kansas Supreme Court held that the portion of the statute criminalizing reckless criminal threats was unconstitutional and that convictions obtained pursuant to the statute would be subject to the constitutional harmless error test. Because the evidence in this case shows that Solton acted intentionally rather than recklessly, we affirm.

1

The State charged Solton with one count of criminal threat in violation of K.S.A. 2018 Supp. 21-5415(a)(1), a severity level 9 person felony, for "unlawfully and feloniously communicat[ing] a threat to commit violence, with the intent to place another in fear; to-wit: Ashley Marie Hurde, or with reckless disregard of the risk of causing such fear." The State also charged Solton with one count of domestic battery, a class B person misdemeanor.

Solton's case proceeded to a jury trial, where Hurde testified she was dating Solton in March 2019. That month, one of Hurde's friends contacted the police and asked them to perform a welfare check on Hurde. Officer Michala Todd called Hurde on March 19, 2019, and during the call, Hurde reported that Solton had been physically abusing her. Hurde met with Officer Todd in person the following day. Officer Todd photographed Hurde's injuries, including scratches, bruising on her arm from being grabbed forcefully, bruising on her shin from being kicked, and bruising on her buttock from being punched six to eight times. Hurde also reported pain from being struck in the rib cage, which made it difficult to breathe.

Hurde testified that at the time she spoke to Officer Todd, Solton had been beating her for approximately six weeks and that the abuse had been escalating. Hurde was afraid that if she called the police, Solton would kill her and her son before killing himself. Hurde further testified that on the morning of March 20, 2019, Solton threatened to kill her and her five-year-old son and told her that "he would cut off [her] toes and fingers," as well as her son's.

The jury found Solton guilty of criminal threat and domestic battery. The district court sentenced Solton to 15 months' imprisonment for the criminal threat conviction and a consecutive 6-month jail sentence for the domestic battery conviction.

Solton appeals.

## DISCUSSION

*The State has established beyond a reasonable doubt that any error in convicting Solton under a partially unconstitutional alternative means statute is harmless.*

Solton's criminal threat conviction arose under K.S.A. 2020 Supp. 21-5415(a)(1). This statute provides in part that "[a] criminal threat is any threat to . . . [c]ommit violence communicated with intent to place another in fear . . . or in reckless disregard of the risk of causing such fear." K.S.A. 2020 Supp. 21-5415(a)(1). The Kansas Supreme Court has explained that "[b]y defining criminal threat as either an intentional or a reckless act, the Legislature created alternative means of committing the offense." *State v. Johnson*, 310 Kan. 835, 839, 450 P.3d 790 (2019). Shortly after Solton's trial, the Kansas Supreme Court held "that the making-a-threat-in-reckless-disregard alternative is unconstitutionally overbroad." 310 Kan. at 836; see *State v. Boettger*, 310 Kan. 800, 450 P.3d 805 (2019).

In *Boettger*, the defendant's conviction was based solely on the reckless disregard provision of K.S.A. 2018 Supp. 21-5414(a)(1), so the court reversed it as unconstitutional. 310 Kan. at 800. In *Johnson*, the State charged Ryan Johnson with intentionally or recklessly making a criminal threat. The jury was instructed on both mental states, and the jury verdict form did not ask the jury to indicate whether it found Johnson acted intentionally or recklessly. The court employed the constitutional harmless error test to determine whether Johnson's conviction should be reversed. Ultimately, the *Johnson* court determined that the State did not meet its burden of establishing harmless error. 310 Kan. at 843-44.

3

Solton and the State agree that the constitutional harmless error test applies to Solton's criminal threat conviction.

"A constitutional error is harmless if the State can demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Johnson*, 310 Kan. 835, Syl. ¶ 5.

The *Johnson* court considered several circumstances in concluding that the error was not harmless, stating:

"The district court instructed the jury on both forms of criminal threat and accurately recited the definitions of 'intentionally' and 'recklessly' in K.S.A. 2018 Supp. 21-5202(h) and (j). But neither the jury instructions nor the State's arguments steered the jury toward convicting Johnson based solely on one mental state or the other. Nor did the judge instruct the jury it had to agree unanimously on whether Johnson acted intentionally or recklessly. And the verdict form did not require the jury to make a specific finding. Thus, the record provides no basis for us to discern whether the jury concluded that the State had proved beyond a reasonable doubt that Johnson acted intentionally." 310 Kan. at 843.

Another important component to the *Johnson* analysis was the evidence presented at trial. The State presented evidence from two police officers that Johnson had threatened to kill his mother and burn her house down. Johnson's mother testified that she did not recall what Johnson said to her and also that "the family commonly threatened to kill each other but did not mean it." 310 Kan. at 837. She believed the police "may have misinterpreted what she said because she was in a highly excited state and had been discharged from the hospital two days earlier and was still under the effect of morphine." 310 Kan. at 838. Johnson testified that he did not threaten anyone. In light of this conflicting evidence, the *Johnson* court said that a reasonable juror could have concluded

4

that any statements made by Johnson "were made with a reckless disregard for whether they caused fear." 310 Kan. at 844.

There have been several cases decided after *Johnson* that provide additional insight into the issue of whether the State can establish beyond a reasonable doubt that instructing the jury on recklessness was harmless error. See *State v. Lindemuth*, 312 Kan. 12, 470 P.3d 1279 (2020); *State v. Stevenson*, 59 Kan. App. 2d 49, 478 P.3d 781 (2020), *rev. denied* 313 Kan. 1045 (2021); *State v. Dah*, No. 121,433, 2021 WL 1323810 (Kan. App. 2021) (unpublished opinion), *petition for rev. filed* May 10, 2021; *State v. Cardillo*, No. 120,606, 2021 WL 1149145 (Kan. App. 2021) (unpublished opinion); *State v. Dreiling*, No. 121,279, 2021 WL 520059 (Kan. App. 2021) (unpublished opinion), *petition for rev. filed* March 15, 2021. Each of these cases presented roughly the same scenario: the defendant was charged with criminal threat under the theory that the offense was committed with the intent to place another in fear or with reckless disregard of the risk of causing fear in another; the jury was instructed on both the intentional and reckless disregard versions of the statute; neither the jury instructions nor the State's arguments directed the jury to convict the defendant based solely on one mental state or the other; and the district court did not instruct the jury that it had to agree unanimously on the defendant's mental state. In each case, the appellate court determined that the evidence did not clearly establish that the threat was made with the intent to place another in fear.

In *Lindemuth*, Roberto Rendon, a truck driver, stopped in Topeka and parked his trailer in a parking lot at a shopping center owned by Kent Lindemuth. Rendon detached his cab and left for 30-45 minutes to get supplies for his trip. When Rendon returned, his trailer was gone. Rendon called his employer Michael Matthews, who was in Oklahoma, to tell him what happened. Rendon also called the Topeka Police Department. While Rendon was making calls, he saw Lindemuth walking towards him. Rendon described Lindemuth as "'very belligerent'" and noticed that he openly carried a gun. 312 Kan. at

5

13. When Rendon asked Lindemuth about the trailer, Lindemuth told Rendon to get off of his property.

Lindemuth refused to tell anyone where the trailer was for the next six hours. Lindemuth did not answer when the police knocked at his door, but he did call his lawyer who spoke with police. Matthews called Lindemuth several times. According to Matthews, Lindemuth wanted Matthews to pay him $20,000 or $30,000 to retrieve the trailer. Matthews also said that Lindemuth threatened to kill him on every phone call except the first one. Matthews told Lindemuth that he knew Lindemuth had a gun, but that Matthews planned to go to Topeka to get the trailer. In response, Lindemuth told Matthews that if he came to Topeka, Lindemuth would shoot him. Matthews drove to Topeka, and when he arrived he tried to find Lindemuth even though Lindemuth continued threatening to kill Matthews. Lindemuth denied making any threats to Matthews. Ultimately, Lindemuth was convicted of criminal threat.

While examining the evidence for harmless error, the Kansas Supreme Court noted that because Lindemuth denied threatening Matthews, "his alleged threat to commit violence and communication of it with the *intent* to place Matthews in fear—versus his *reckless* disregard of the risk of causing fear in another—obviously must come from other evidence." 312 Kan. at 18. The court went on to conclude that even if the jury believed Matthews' version of the conversations, "Lindemuth simply spoke in the heat of argument and the result of unthinking rage—more reckless, impulsive bluster than an intentional threat." 312 Kan. at 18. For example, Lindemuth only threatened to kill Matthews after Matthews told him, "'I know that you're toting a pistol, but I'm coming up there [to Topeka]. And . . . you're either going to give me that trailer back [or] we're getting into it.'" 312 Kan. at 18. The court also thought that the jury could have considered Matthews' reactions to Lindemuth's statements as evidence of recklessness, "[s]pecifically, a jury may have found support for his 'recklessness' by acknowledging that despite Lindemuth's purported threats to shoot and kill Matthews if he came to

6

Topeka, Matthews nevertheless traveled there from Oklahoma to confront Lindemuth." 312 Kan. at 18. "Matthews' conduct would appear to be at least inconsistent with a person's usual reaction to true threats, i.e., those communicated with the *intent* to place another in fear of violence." 312 Kan. at 18. Further, when Matthews arrived in Topeka and asked Lindemuth where he was, "the trash talking Lindemuth apparently made no effort to meet Matthews. In sum, Lindemuth apparently had his impulsive bluff called." 312 Kan. at 19.

In *Cardillo*, this court reversed Joseph Cardillo's conviction for criminal threat after finding that the jury could have believed Cardillo made the statements at issue with reckless disregard for whether they caused Amanda Sisco fear. 2021 WL 1149145, at *6. Cardillo and Sisco were sitting in the back of a police patrol vehicle while the police conducted a narcotics investigation. Before putting them in the vehicle, police discovered a bag of methamphetamine on the ground near where Sisco had been standing. When Sisco and Cardillo were placed in the patrol vehicle, their conversation was recorded. Sisco accused Cardillo of throwing the drugs at her and demanding that she take possession of them. Cardillo repeatedly told Sisco that she needed to tell the police that the methamphetamine was hers. Cardillo also "explicitly threatened to kill [Sisco] and at other points strongly insinuated the same." 2021 WL 1149145, at *2. However, Cardillo later "retreated from his threat to kill Sisco at two points." 2021 WL 1149145, at *5. First, when Sisco told him she was either going to lose her kids or lose her life, Cardillo responded that she was "'not going to lose nothing.'" 2021 WL 1149145, at *5. And, when Sisco asked Cardillo if he was going to kill her he said, "'No. No. No.'" 2021 WL 1149145, at *5.

In analyzing the statements, this court noted that a jury might have viewed Cardillo's statements as the same type of "'impulsive bluster'" the Kansas Supreme Court found in *Lindemuth* because Cardillo did not reaffirm the threat when Sisco brought it back up. *Cardillo*, 2021 WL 1149145, at *5. "Given the circumstances," this court stated,

7

"the jury *could* have found the statements to be reckless criminal threat, a threat 'simply spoke[n] in the heat of argument and the result of unthinking rage,' rather than an intentional threat." 2021 WL 1149145, at *5 (quoting *Lindemuth*, 312 Kan. at 18).

This court arrived at a similar conclusion in *Stevenson* when it overturned John Stevenson's conviction for criminal threat. The evidence at trial showed that Police Chief Taft Yates arrested Stevenson and took him to the police station. Stevenson was handcuffed. Stevenson was belligerent and agitated and made repeated threats to Chief Yates, including telling Yates that he would hang him and also that he would "'fuck [Yates] all up.'" 59 Kan. App. 2d at 52. Stevenson "testified he was 'just upset and venting[.]' He did not mean to threaten Yates and 'was just talking shit.'" 59 Kan. App. 2d at 54. This court found the case highly analogous to *Johnson* and *Lindemuth*. *Stevenson*, 59 Kan. App. 2d at 62. It held that the jury could have believed Stevenson's testimony that he was "just 'talking shit' and 'venting'" and concluded that the statements were reckless criminal threat. 59 Kan. App. 2d at 63. The court also found it notable that Stevenson was handcuffed during the encounter. 59 Kan. App. 2d at 63.

In *Dah*, Jaw Dah's wife went to Family Crisis Services and reported that Dah had choked her and hit her in the head. She also recounted prior incidents of Dah choking and raping her. Dah's wife did not want to move to a safe house or shelter at that time. Two days later, she returned to the crisis center and informed workers that she and Dah had visited their priest and everything was okay. She returned to the crisis center a third time a couple months later and told a worker that Dah had threatened to kill her and her children. The crisis center placed Dah's wife and children in a safe home that day. Following an investigation, Dah was eventually charged with and convicted of numerous crimes, including criminal threat. *Boettger* and *Johnson* were decided after Dah's conviction. Based on those cases, this court reversed Dah's conviction for criminal threat because "[t]he record reveal[ed] that Dah made similar threats on many occasions and

8

had not followed through on those threats," so there was "a possibility the jury could have found Dah's conduct to be reckless rather than intentional." 2021 WL 1323810, at *5.

Finally, in *Dreiling*, this court reversed Joseph Dreiling's conviction for criminal threat. Dreiling's brother, who worked as an animal control officer, impounded Dreiling's dog, which upset Dreiling as he did not have the ability to pay the impound fine. When Dreiling next saw his brother, Dreiling told him that he "had 'until sundown' to give him his dog back or he was 'going to regret it.'" 2021 WL 520059, at *1. At 5 p.m. that day, Dreiling told one of his nieces that he was going to kill his brother and blow up the house that Dreiling lived in, which was owned by his brother. Dreiling also stated his intentions on Facebook, posting that he would blow himself up and burn the house down if his dog was not returned. Dreiling posted photos of the house in which lit candles, cans of gasoline, and a propane tank with the nozzle pointed at a lit oil lamp were visible. Police arrived and, after a while, were able to get Dreiling to extinguish the candles and lamp before they took him into custody. At trial, Dreiling testified "that he often fought with his brother but that it was a matter of 'a lot more talk but no action.'" 2021 WL 520059, at *2. He also said "he was 'not expecting anything other than a keyboard war with his brother.'" 2021 WL 520059, at *2. In reversing Dreiling's conviction for criminal threat, this court noted that "Dreiling testified at trial that he had no intention to place anyone in fear," thus, the jury could reasonably have found Dreiling to be guilty of either intentional or reckless criminal threat. 2021 WL 520059, at *4.

Solton's case is similar in some aspects to *Johnson* and the cases that followed. The jury in Solton's case was instructed on both forms of criminal threat although the district court did not define the terms "recklessly" or "intentionally." The jury instructions did not steer the jury toward convicting Solton based solely on one mental state or another, and the judge did not instruct the jury that it had to agree unanimously on whether Solton acted intentionally or recklessly. The jury verdict form did not require the

9

jury to make a specific finding on this issue. In its closing argument, the prosecutor mentioned both intentional and reckless criminal threat.

The most significant difference between Solton's case and those discussed above is the evidence presented in this case. The evidence is distinctly different than the evidence in the cases discussed above. There is no evidence that Solton frequently made prior empty threats, as in *Johnson*, *Dah*, and *Dreiling*. Instead, the trial testimony exposed only one threat—Solton's threat to mutilate and kill Hurde and her son. This threat was made after weeks of escalating abuse. The victim in this case also did not downplay the seriousness of the threat like the alleged victims in *Johnson* and *Lindemuth*. Rather, Hurde told police that she truly feared he would kill her and her son. There was no evidence that Solton retreated from his threat, like the defendant in *Cardillo*. Similarly, there was no testimony that Solton was merely venting, like the defendant in *Stevenson* or *Dreiling*, that the jury could have considered. This case established a clear willingness by Solton to resort to violence and a clear belief by Hurde that Solton would continue to resort to violence.

The evidence in this case is substantially different than the evidence in *Johnson* and the cases that followed. "Intentional criminal threat is a threat to commit violence communicated with intent to place another in fear." *State v. McFarland*, 60 Kan. App. 2d 1, Syl. ¶ 1, 485 P.3d 178, *rev. denied* 313 Kan. 1044 (2021). "'The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur."'" *Boettger*, 310 Kan. at 812 (quoting *Virginia v. Black*, 538 U.S. 343, 359-60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 [2003]). Based on the evidence presented at trial, the State can demonstrate beyond a reasonable doubt that there was no error in convicting Solton. The evidence indicates that Solton made his threat to Hurde with the intent to place her in fear.

Affirmed.