NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0913-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CALVIN FAIR,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **December 9, 2021**
>
> **APPELLATE DIVISION**

Argued October 19, 2021 – Decided December 9, 2021

Before Judges Fisher, Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 15-08-1454.

Daniel S. Rockoff, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Daniel S. Rockoff, of counsel and on the brief).

Carey J. Huff, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lori Linskey, Acting Monmouth County Prosecutor, attorney; Carey J. Huff, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Defendant was charged in a one-count indictment of making terroristic threats within the meaning of "N.J.S.A. 2C:12-3a and/or b." The indictment was never amended, and defendant never moved for a particularization of what part of N.J.S.A. 2C:12-3 was being charged. Instead, the matter went to trial and, after two days of testimony, the jury was asked to decide: whether, on May 1, 2015, defendant threatened to commit a crime of violence "with the purpose to terrorize" Officer Sean Healey, or whether he made that threat "in reckless disregard of the risk of causing such terror," or whether he made that threat "with the purpose to put [Officer Healey] in imminent fear of death" under circumstances reasonably causing Officer Healey "to believe the immediacy of the threat and the likelihood it would be carried out." The jury responded "guilty" to this multi-faceted question.

Defendant appeals, arguing (1) the reckless-disregard portion of N.J.S.A. 2C:12-3(a) is unconstitutionally overbroad, and (2) the indictment, jury instructions, and verdict sheet were "poorly structured," making it "[im]possible to know whether the jury reached a truly unanimous verdict." We agree with both arguments. The reckless-disregard portion of N.J.S.A. 2C:12-3(a) is unconstitutionally overbroad because it has the capacity to criminalize speech and expressions protected by the First Amendment. This holding alone requires

2

that defendant be given a new trial since no one can tell from the jury verdict whether defendant was convicted under the unconstitutional portion of N.J.S.A. 2C:12-3(a) or the remaining provisions which clearly pass constitutional muster. We also agree with defendant's argument that the jury verdict sheet insufficiently guarded against the lack of jury unanimity.

We first discuss the evidence adduced at trial and the manner in which the jury was asked to determine defendant's guilt, and then explain why the reckless-disregard portion of N.J.S.A. 2C:12-3(a) is unconstitutionally broad, followed by a discussion as to why the judge's instructions did not ensure a unanimous verdict as required by Rule 1:8-9.

The jury heard evidence that, on May 1, 2015, Patrolmen Sean Healey and Samuel Hernandez, as well as another officer, responded to an alleged domestic violence incident at defendant's Freehold home. When they arrived, officers found L.W., defendant's girlfriend, standing outside with her child; defendant was inside. L.W. explained to the officers that she was asked to leave the home and she merely wanted her television, still inside, before departing. Defendant then began yelling from a second-story window. An exchange between defendant and the officers that lasted about twenty minutes was recorded by a

dash-mounted motor vehicle recording device; it included the following

excerpts:

> DEFENDANT: (Indiscernible). Please. Just leave. Just leave this property. Because I don't want nothing -- I don't want to talk. There's nothing to talk about. All I did was put her stuff out and she can leave. This is private property. Please just leave. I don't want --
>
> . . . .
>
> DEFENDANT: -- back up. If she wants the TV she can have that, but I want you all to leave off my property, because you all cause too much -- too much chaos over here for nothing.
>
> HEALEY: Okay.
>
> DEFENDANT: She call you over here for nothing.
>
> HEALEY: Calvin, --
>
> DEFENDANT: For nothing.
>
> HEALEY: -- you want to give her the TV now?
>
> . . . .
>
> DEFENDANT: I want her to leave my property. . . . So give her the TV. I don't want to try to keep nothing she owns.
>
> HEALEY:  Okay.
>
> [ANOTHER OFFICER]:  We're off your property.
>
> DEFENDANT: Because it's -- it's -- it's petty bro. Petty.

A-0913-19

. . . .

DEFENDANT: I don't understand. Like, you all come -- like, this is (indiscernible). How many times you all been through this? How many times (indiscernible) over here and (indiscernible) you all have to think of. How many times?

. . . .

DEFENDANT:  Just leave my property.

HEALEY:  It's my fault?

DEFENDANT: I'm taking care of my mother.

HEALEY: It's my fault now?

DEFENDANT: I'm taking care of my mother.

. . . .

DEFENDANT: Just leave the property. There's nothing to talk about. Just (indiscernible) --

HEALEY: Yeah, so you can keep barking at me and --

. . . .

HEALEY: Hey, all right. We're going to go. Have a good day, Calvin. Thank you for your cooperation.

. . . .

L.W.:  Calvin, go in the house before you get in trouble.

DEFENDANT: -- ass nigga. You're the fucking devil.

5

L.W.: Go ahead before you get in trouble.

HERNANDEZ: What kind of devil are you?

HEALEY: I don't know.

. . . .

HEALEY: You're the one barking out of the window like a six-year-old.

. . . .

DEFENDANT: -- (indiscernible), you won't even leave.

. . . .

DEFENDANT: -- (indiscernible) it's nothing. It is about nothing. That's what I'm talking about. The devil. (Indiscernible) you the fucking devil, nigga. Fucking devil. I never did anything to fucking disrespect you or any officer, nigga. So what is -- what was you trying to convince her to sign a complaint? On what? For nothing. For nothing.

. . . .

HEALEY: We'll be back with your warrant.

HERNANDEZ: And then --

HEALEY: So, have fun.

. . . .

DEFENDANT: You fucking devil ass nigga.

6

. . . .

DEFENDANT: I'm taking care of my mother right now, yo.

HEALEY: Okay. That's why I said we'll be back. It's fine. Go back and take care of your mother.

DEFENDANT: Who cares if you coming back? That don't mean nothing.

HEALEY: Listen to yourself.

DEFENDANT: And a $200,000 bail and (indiscernible) and now you think I'm fucking -- a fucking -- complaint now on me?

. . . .

DEFENDANT: You talking crazy, nigga, talking about signing a fucking complaint. Like that shit means something. Always trying to break somebody's ass. That's all you think about, breaking somebody's ass. Sign a complaint to what? I never did anything to you. (Indiscernible), nigga.

. . . .

HERNANDEZ: Go back inside, brother.

DEFENDANT: Absolutely nothing. I never did anything. You (indiscernible) sign a complaint. Get the fuck out of here, nigga.

HEALEY: That's disorderly conduct, too.

. . . .

A-0913-19

DEFENDANT: (Indiscernible) fucking tough guy.

HEALEY: I'm not the one hanging out the window.

. . . .

HEALEY: Come out here.

DEFENDANT: Yeah, I'm hanging out the window because I'm taking care of my fucking mother, my 83-year-old mother, nigga.

. . . .

DEFENDANT: I don't got nothing to come down there to talk to you about. I didn't do anything, so why I got to talk to you?

. . . .

DEFENDANT: Fucking thirsty ass nigga. You thirsty. Worry about a head shot, nigga.

HEALEY: And that there is a threat.

HERNANDEZ: That is threats right there.

With those last comments, the officers departed.

Later, Officer Healey checked defendant's Facebook page, finding the following statements posted on Facebook by defendant on April 8, 2015:

Yall niggas gonna fu$kin morn! R yall tryin take another life, its probably sumbdy yu growup with right! Smh Whts its gonna take! To see another life go right Smh for all yu niggas tht wanna be on ur bs at times

like this! Im take ur fu$kin soul! And all thm hammers they found inn my house! None of thm was mines, I still got all of mines[1] lol Im askin yu freehold niggss ni$e, PlZ DON'T DO THIS BEEFIN SHIT AT A TIME LIKE THIS. -- [angry face emoji] feeling mad.

On April 9, 2015, defendant posted again:

> This is a post for, Freehold Boro poli$e, Homdel State poli$e, & Monmouth county Tfor$e, FBI, DEA, keep wall wat$hin ur not gonna get my life from fb doesn't show anythg about my life but only tha thgs i wanna post lol Oh yea . . . it does show I TAKE VERY GOOD $ARE OF MY MOTHER & KIDS LMFAO KEEP TRYING. -- [tongue-out emoji] feeling silly.

Defendant also added a comment to this post: "I hope after everythg is done!! I hope they burn freehold down!!! [smiley face emoji] & yu if look my way again, im joinin ISIS. Lol."

Defendant posted a similar message on Facebook about an hour after the officers left his home on May 1, 2015, followed by an additional comment a few hours later: "THN YU GOT THESE GAY ASS OFFI$ERS THINKIN THEY KNO UR LIFE!!! GET THA FU$K OUTTA HERE!! I KNO WHT YU DRIVE & WHERE ALL YU MOTHERFU$KERS LIVE AT." All these social media statements were admitted into evidence at trial.

---

[1] Put in perspective, the record reveals that a few months earlier, the State Police raided the same home – in which defendant, his mother, and three tenants resided – and seized multiple handguns and heroin.

A-0913-19

The State called three witnesses to testify: Officers Healey and Hernandez, and Detective Richard Schwerthoffer, who testified about the search of defendant's home in February 2015 and his suggestion on May 1, 2015 that Officer Healey look into what might be on defendant's Facebook page. Defendant called Officer Healey to testify in his case and then rested.

In charging the jury, the judge read the single count of the indictment – repeating the confusing statement in the indictment that defendant was charged with acting "contrary to the provisions of N.J.S.A. 2C:12-3(a) and/or (b)" (emphasis added)[2] – and then read N.J.S.A. 2C:12-3(a), appropriately leaving out irrelevant phrases:

> A person is guilty of a crime if he threatens to commit any crime of violence with the purpose to terrorize another or in reckless disregard of the risk of causing such terror.[3]

---

[2] See State v. Gonzalez, 444 N.J. Super. 62 (App. Div. 2016) (recognizing the dangers of the phrase "and/or" in similar circumstances).

[3] Subsection (a) of N.J.S.A. 2C:12-3 states in full:

> A person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience. A violation of

A-0913-19

The judge then broke down the statute for the jury, explaining that to convict the State was required to prove beyond a reasonable doubt two things, the first being that defendant "threatened to commit a crime of violence." The second element was described in alternatives, requiring the jury to determine whether the threat: "was made with the purpose to terrorize another" or was made "in reckless disregard of the risk of causing such terror." He then defined for the jury the words "purposely" and "recklessly."

The trial judge then told the jury that "[t]here's another form of terroristic threats that applies to this case," referring to N.J.S.A. 2C:12-3(b), which he quoted in pertinent part as follows:

> A person is guilty of a crime if he threatens to kill another with the purpose to put him in imminent fear of death under circumstances reasonably causing the

---

this subsection is a crime of the second degree if it occurs during a declared period of national, State or county emergency. The actor shall be strictly liable upon proof that the crime occurred, in fact, during a declared period of national, State or county emergency. It shall not be a defense that the actor did not know that there was a declared period of emergency at the time the crime occurred.

[Emphasis added.]

As with his description of subsection (a), the judge sensibly read to the jury only the emphasized parts of subsection (b).

victim to believe the immediacy of the threat and the likelihood that it will be carried out.[4]

As for this part of the charge, the judge described for the jury the three elements the State needed to prove beyond a reasonable doubt in order to convict, namely: (1) "[t]hat defendant threatened to kill another person"; (2) "[t]hat the threat was made with the purpose to put the person in imminent fear of death"; and (3) "[t]hat the threat was made under circumstances which reasonably caused the person to believe that the threat was likely to be carried out." The judge then accurately defined each of these elements for the jury.

After additional instructions not relevant here, the judge told the jurors that "[t]he verdict must represent the considered judgment of each juror and must be unanimous as to each charge. This means you must all agree if the defendant is guilty or not guilty of the charge."

The judge did not explain that a unanimous verdict was required on any one of the different terroristic-threat allegations charged here. Near the end of the charge, the judge provided the jury with a verdict sheet, which asked the jury to determine whether defendant was guilty or not guilty of the following:

> On or about 01 May 2015 in the Borough of Freehold, [d]efendant Calvin Fair did commit the crime of

---

[4]  The judge quoted the statute verbatim, leaving out only the statute's reference to that crime as being "of the third degree."

> [t]erroristic [t]hreats by threatening to commit a crime of violence with the purpose to terrorize Sean Healey, or in reckless disregard of the risk of causing such terror, or by threatening to kill Sean Healey with the purpose to put him in imminent fear of death under circumstances reasonably causing Sean Healey to believe the immediacy of the threat and the likelihood it would be carried out.

The jury started deliberating shortly after noontime and continued until sent home about three hours later.

The next day the jury continued deliberating until, later in the afternoon, it sent to the judge a note posing the following question: "Do both 2C:12-3(a) and 2C:12-3(b) have to be proven beyond a reasonable doubt or just one or the other?" In a brief colloquy with counsel, the judge revealed he intended to tell the jury that it could be either one – that the jury did not have to find guilt beyond a reasonable doubt under both subsections (a) and (b) – to which the prosecutor and defense counsel agreed. The judge then instructed the jury that the prosecution had "two alternative theories of terrorist threats," and he again described the elements of those theories. At the conclusion of his remarks, the judge added:

> So, yes, the answer [to the jury's question] is it could be . . . one or the other, but in either event it has to be proven beyond a reasonable doubt to your satisfaction.

He lastly instructed the jurors that if he had not answered the question to their satisfaction, they should send out another note. The jury sent no further notes and returned a guilty verdict twenty minutes later.

As can be seen, the jury was permitted to find defendant guilty without specifying whether it found defendant violated subsection (a) or (b) of N.J.S.A. 2C:12-3, or, if it found defendant guilty under subsection (a), whether he acted "with the purpose to terrorize another" or whether he acted "in reckless disregard of the risk of causing such terror."

Because we conclude, as defendant has argued, that the "reckless disregard" portion of subsection (a) of N.J.S.A. 2C:12-3 is unconstitutionally overbroad, defendant must be given a new trial because the manner in which the jury was asked to publish their verdict does not reveal whether it found defendant guilty under the "reckless disregard" standard. We also agree with the argument that the judge's instructions did not ensure that the jury was unanimous on whatever portion of N.J.S.A. 2C:12-3 it may have convicted defendant of committing. We turn first to the constitutional argument.

I

Defendant argues N.J.S.A 2C:12-3(a) is unconstitutionally overbroad because it proscribes speech that does not constitute a "true threat." He argues

the First Amendment requires proof that a speaker specifically intended to terrorize and subsection (a)'s reckless-disregard element is facially invalid, and the statute is overbroad, because it "permits a true threat prosecution even if a reasonable listener would not have believed that the threat would be carried out." We agree.[5]

The First Amendment declares that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This limitation on governmental power is made applicable to the States by the Fourteenth Amendment. Janus v. AFSCME, Council 31, 138 S. Ct. 2448, 2463 (2018). "The First Amendment generally prevents government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." R.A.V. v. St. Paul, 505 U.S. 377, 382 (1992) (citations omitted). The Supreme Court, however, has recognized "a few limited" categories of speech which may be restricted based

---

[5] Defendant's notice of appeal did not identify the pretrial order that denied his motion to dismiss the indictment on First Amendment grounds as required by Rule 2:2-3 to preserve the argument for appellate review. But because defendant has raised important constitutional issues that have been thoroughly briefed by both sides, we exercise our discretion to consider the issue despite defendant's mistaken failure to comply with Rule 2:2-3. See Kornbleuth v. Westover, 241 N.J. 289, 299 (2020); Ridge at Back Brook, LLC v. Klenert, 437 N.J. Super. 90, 97 n.3 (App. Div. 2014).

on their content, including defamation, obscenity, "fighting words," incitement to imminent lawless action, and – as relevant here – true threats. Virginia v. Black, 538 U.S. 343, 358-59 (2003).

The true threat doctrine originated in Watts v. United States, 394 U.S. 705 (1969), where the defendant was convicted under a federal statute that prohibited "knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President of the United States"; the defendant stated at a public rally that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." Id. at 705-06. The Court held that the defendant's conviction violated the First Amendment, reasoning that, in context, his statement was not a "threat" but mere political hyperbole. Id. at 708. In so ruling, the Court emphasized our "profound national commitment to the principle that debate on public issues . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," as well as "vituperative, abusive, and inexact" language. Ibid. (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).

Defendant argues N.J.S.A. 2C:12-3(a) also goes too far because, by authorizing convictions based on speech made in "reckless disregard" for its consequences, the statute crosses the constitutional line the Supreme Court drew

16

in Black. That is, Black held that Virginia's statute did "not run afoul of the First Amendment" because it did not just ban cross burning; it banned cross burning "with intent to intimidate." 538 U.S. at 362. The Court held that a state can punish threatening speech or expression only when the speaker "means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id. at 359 (emphasis added).

Following Black, some federal courts of appeals recognized that, when charging a threat crime, the prosecution must prove that the speaker intended to intimidate or terrorize and anything less would fall outside the "true threat" exception to the First Amendment's protection. In United States v. Bagdasarian, 652 F.3d 1113, 1118 (9th Cir. 2011), the court of appeals, recognizing the inconsistencies in its own pre-Black cases, concluded in the wake of Black "that 'the element of intent [is] the determinative factor separating protected expression from unprotected criminal behavior'" (quoting United States v. Gilbert, 813 F.2d 1523, 1529 (9th Cir. 1987)). And, so, the Bagdasarian court held that an Act of Congress, which made it a felony to threaten to kill or do bodily harm to a major presidential candidate, required proof that "the speaker subjectively intend[ed] the speech as a threat." Ibid. Another court of appeals

17

reached this same result in considering a prosecution brought under an Act of Congress which criminalized the transmission in interstate commerce of "any communication containing . . . any threat to injure the person of another." United States v. Heineman, 767 F.3d 970, 972, 978-79 (10th Cir. 2014) (reading Black to require proof that the defendant "intended the recipient to feel threatened"). And a third found it unnecessary to decide the issue but stated in dictum that "[i]t is more likely . . . an entirely objective definition is no longer tenable." United States v. Parr, 545 F.3d 491, 500 (7th Cir. 2008).[6]

Closer to the issue before us, Kansas's highest court analyzed and found unconstitutionally broad K.S.A. 2018 Supp. 21-5415(a)(1), a statute similar to N.J.S.A. 2C:12-3(a) in that it proscribes threats made "in reckless disregard of causing fear." State v. Boettger, 450 P.3d 805, 818 (Kan. 2019). The Kansas Court held that a "reckless disregard" standard rendered the statute unconstitutionally overbroad, concluding that Black does not permit a conviction for speech or expression unless the speaker "possessed the subjective

---

[6] We are mindful that not all federal courts of appeals view Virginia v. Black as did the courts of appeals for the Seventh, Ninth and Tenth Circuits. That is, these other courts have determined that proof of an intent to make the statement is constitutionally necessary, not the intent to threaten. See United States v. Martinez, 736 F.3d 981, 986-87 (11th Cir. 2013); United States v. Jeffries, 692 F.3d 473, 479-80 (6th Cir. 2012); United States v. White, 670 F.3d 498, 508-09 (4th Cir. 2012); United States v. Mabie, 663 F.3d 322, 332 (8th Cir. 2011).

18

intent to both (1) utter threatening words and (2) cause another to fear the possibility of violence." Boettger, 450 P.3d at 807-10. After wading through the various decisions of the federal courts of appeals which interpreted the Black majority opinion and its invocation of the word "intent" in its definition of a true threat as merely suggesting an intent to utter the words, see, e.g., footnote 6, the Boettger court expressed its agreement with Heineman, in which the court held that Black "establish[ed] that a defendant can be constitutionally convicted of making a true threat only if the defendant intended the recipient of the threat to feel threatened," 450 P.3d at 814 (quoting Heineman, 767 F.3d at 978), and stated its agreement with the conclusion reached by Bagdasarian as well. The Boettger court thus concluded that Black's majority "determined an intent to intimidate was constitutionally, not just statutorily, required." Id. at 815.

In stating our agreement with the Kansas Supreme Court's application of Virginia v. Black to a statute similar to N.J.S.A. 2C:12-3(a), we recognize that the matter is not entirely free from doubt. Other state courts have reached different results than the Kansas Supreme Court, see State v. Taupier, 193 A.3d 1, 18-19 (Conn. 2018); Major v. State, 800 S.E.2d 348, 352 (Ga. 2017), while another state court suggested in dictum that a subjective intent to threaten is constitutionally required, Brewington v. State, 7 N.E.3d 946, 964 (Ind. 2014).

19

See also State v. Carroll, 456 N.J. Super. 520, 538-43 (App. Div. 2018) (discussing these concepts in the context of a conviction for retaliation against a witness, N.J.S.A. 2C:28-5(b)). As we have already observed, there is a disagreement among the federal courts of appeals about Black's reach, and Black itself did not expressly consider a "reckless disregard" element like that contained in N.J.S.A. 2C:12-3(a).

We also recognize that the Supreme Court of the United States has been presented with opportunities to express its view of the "reckless disregard" element in this setting but has declined those invitations. For example, in Elonis v. United States, 575 U.S. 723, 740 (2015), the Court expressly chose not to say whether reckless speech could support a threat conviction under 18 U.S.C. § 875(c). That two members of the Court, for different reasons, suggested recklessness might be sufficient, 575 U.S. at 745-48 (Alito, J., concurring in part and dissenting in part); id. at 759-60 (Thomas, J., dissenting), is of no moment. Later, in Perez v. Florida, 137 S. Ct. 853 (2017), the Court denied a writ of certiorari in a case that might have settled the issue; a single Justice stated her view that both Watts and Black had already made "clear that to sustain a threat conviction without encroaching upon the First Amendment, States must prove more than the mere utterance of threatening words – some level of intent is

required" and "it is not enough that a reasonable person might have understood the words as a threat – a jury must find that the speaker actually intended to convey a threat." Id. at 855 (Sotomayor, J., concurring). More recently, the Court denied Kansas's petition for a writ of certiorari in Boettger; this time only Justice Thomas dissented from the denial of certiorari, expressing a view that none of the Court's prior decisions prohibited utilization of a reckless disregard standard in a threat case, that the Court should resolve the conflict among the federal courts of appeals and decisions rendered by state courts, that "the Constitution likely permits States to criminalize threats even in the absence of any intent to intimate," Kansas v. Boettger, 140 S. Ct. 1956, 1958-59 (2020) (Thomas, J., dissenting), and that the Kansas Supreme Court had "overread" Black, id. at 1956.

While it may be true that the views expressed in unjoined separate opinions might provide some insight into how three sitting Justices might rule when the issue eventually comes before the high Court, at present their views possess no precedential value. The dissenting opinions in Elonis, while rendered in a case the Court did hear, were minority views; no other Justice stated an agreement with either Justice Alito's or Justice Thomas's views and they, in fact, did not agree with each other. And the Court's denials of writs of certiorari in

Perez and Boettger "import[] no expression of opinion upon the merits of the case." United States v. Carver, 260 U.S. 482, 490 (1923). As Justice Frankfurter stated, the Court "has said again and again and again that such a denial has no legal significance whatever bearing on the merits of the claim." Durr v. Burford, 339 U.S. 200, 226 (1950) (dissenting opinion). And, if the denial of a writ of certiorari has zero legal value, an opinion expressing an agreement or disagreement with the denial of certiorari is worth less than zero. See Singleton v. Commissioner, 439 U.S. 940, 944-46 (1978) (writing separately about a denied writ of certiorari, Justice Stevens explained "why [he has] resisted the temptation to publish opinions dissenting from denials of certiorari," noting that "if there was no need to explain the Court's action in denying the writ, there was even less reason for individual expressions of opinion about why certiorari should have been granted in particular cases").

In short, it may be that a few members of the Supreme Court have expressed their views about the issue before us, but those views are not binding on us. We are, however, bound by Virginia v. Black and, like the Kansas Supreme Court, we agree that Black strongly suggests the "reckless disregard" element in N.J.S.A. 2C:12-3(a) is unconstitutionally overbroad. To be a true threat – and, by being a true threat, falling outside the First Amendment's

22

protection – a speaker must "mean[] to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. We thus agree with Justice Sotomayor's non-precedential view that "it is not enough that a reasonable person might have understood the words as a threat – a jury must find that the speaker actually intended to convey a threat." Perez, 137 S. Ct. at 855. Because N.J.S.A. 2C:12-3(a) permits a conviction for uttering a threat "in reckless disregard of the risk of causing . . . terror," it unconstitutionally encompasses speech and expression that do not constitute a "true threat" and, therefore, prohibits the right of free speech guaranteed by the First Amendment.[7]

---

[7] We do not overlook the possibility that even if the views of some that there is no federal constitutional infirmity in a threat statute that turns on recklessness are eventually adopted, our state constitution might nevertheless require the result we reach here. Our state constitution contains a free speech clause that has been described as being "broader than practically all others in the nation," Green Party v. Hartz Mountain Indus., Inc., 164 N.J. 127, 145 (2000), and is understood as offering "greater protection than the First Amendment," Mazdabrook Commons Homeowners' Ass'n v. Khan, 210 N.J. 482, 492 (2012). See N.J. Const. art. I, ¶ 6 (providing that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right [and] [n]o law shall be passed to restrain or abridge the liberty of speech or of the press"). Because defendant has not argued N.J.S.A. 2C:12-3(a) violates our state constitutional free speech guarantee, we need not address that potentiality here.

A-0913-19

## II

Our First Amendment holding alone requires that defendant be given a new trial on the other charged aspects of N.J.S.A. 2C:12-3 because the jury's verdict does not reveal whether defendant was convicted on that part of the statute that requires an intent to threaten. For that reason, it is not necessary that we consider defendant's unanimity argument. Nevertheless, so that the mistake is not repeated when defendant is retried on the two remaining theories of criminal liability charged in the indictment, we address his unanimity argument and, for this additional reason, reverse and remand for a new trial.

The Supreme Court has said that our state constitution "presupposes a requirement of a unanimous jury verdict in criminal cases." State v. Parker, 124 N.J. 628, 633 (1991); see also R. 1:8-9. This principle requires that jurors "be in substantial agreement as to just what a defendant did before determining . . . guilt or innocence." State v. Frisby, 174 N.J. 583, 596 (2002) (quoting United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977)). To ensure compliance with this constitutional precept, judges must provide juries with instructions that specifically explain the need for a unanimous verdict in numerous instances when the verdict might not otherwise be clear; the Court explained in Parker when a general unanimity instruction like that given here is not sufficient:

[F]or example, [when] "a single crime can be proven by different theories based on different acts and at least two of these theories rely on different evidence, and [when] the circumstances demonstrate a reasonable possibility that a juror will find one theory proven and the other not proven but that all of the jurors will not agree on the same theory." . . . "[W]here the facts are exceptionally complex, or where the allegations in a single count are either contradictory or only marginally related to one another, or where there is a variance between the indictment and the proof at trial, or where there is a tangible indication of jury confusion. In these instances, the trial court must give an augmented unanimity instruction.

[124 N.J. at 635-36 (citations omitted).]

The trial judge ably explained not only the different elements to be proven when an accused is charged under subsection (a) or subsection (b) but also the different elements depending on which part of subsection (a) is charged, i.e., purposeful conduct or reckless conduct, the last of which we have now found constitutionally infirm. In short, the judge instructed the jury that they could convict defendant if they found beyond a reasonable doubt the elements applicable to any one of three different theories.

Even though neither the prosecution nor the defense sought a specific unanimity charge, or instructions and a jury verdict sheet that would ask the jury to express what it unanimously found defendant guilty of, the jury recognized the problem and asked during their deliberations about the multi-faceted

question put to them. This question should have prompted clear guidance from the judge that the jury could not find defendant guilty via a fragmented verdict. The judge should have explained, for example, that a guilty verdict could not be rendered if only some of the jurors found a violation of subsection (a) but not (b), and the others found a violation of subsection (b) but not (a).

We previously expressed this concern in State v. Tindell, 417 N.J. Super. 530, 553-54 (App. Div. 2011). There, the defendant was charged with a single count of terroristic threats under N.J.S.A. 2C:12-3(a) for directing multiple threats at a "diverse group of individuals" at his sister's high school, including a girl that had an altercation with his sister, but also a police officer and several children and school personnel. The judge failed to give an instruction that recognized the multiplicity of alleged victims and failed to require that the jury identify the victims of the alleged threats. Id. at 551-52. We found the jury instructions erroneously opened the door to a fragmented verdict and reversed. Id. at 555-56. See also State v. Bzura, 261 N.J. Super. 602, 609 (App. Div. 1993).

We recognize that, unlike Tindell, the indictment charged defendant with threatening only Officer Healey, and the jury was instructed to determine only whether Officer Healey was threatened. But the jury was also presented with evidence of multiple statements defendant made that could have been

understood as being directed toward Healey. First, there was defendant's "head shot" comment on May 1, 2015, when defendant was arguing with Officers Healey and Hernandez from a second-story window in his Freehold home. Then, there was defendant's first Facebook post after the May 1, 2015, in-person argument; this post, among other things, went on a diatribe about Freehold police, with comments like "YU WILL PAY WHOEVA HAD ANY INVOLVEMENT" in entering his home – likely referring to the raid on his home in February – with a parting comment that "WE WILL HAVE THA LAST LAUGH! #JUSTWAITONIT – [angry emoji] feeling angry." And two hours after that: THEN YU GOT THESE GAY ASS OFFI$ERS THINKIN THEY KNO UR LIFE!!! GET THA FU$K OUTTA HERE!! I KNO WHT YU DRIVE & WHERE ALL YU MOTHERFU$KERS LIVE AT" (emphasis added).

To be sure, the prosecution's focus throughout the trial was on the "head shot" statement, but these other statements were admitted and no limitation was placed on what the jury could find to be a terroristic threat. So, there was a potential for some jurors to conclude it was only the "head shot" statement that was the terroristic threat, while others could have found the "yu will pay" and "we will have tha last laugh . . . waitonit" postings to be the terroristic threats, or some segment of jurors could have found only the "I kno wht yu drive &

A-0913-19

where yu motherfu$kers live at" was the terroristic threat. This is not mere conjecture. The video of the confrontation between defendant and Healey does not provide overwhelming proof that the "head shot" comment was enough to provide the "terror" required by subsection (a) or the "imminent fear of death" required by subsection (b) because the officers took no immediate action in response at the scene; they simply departed. In some jurors' minds, the head shot comment might not have been enough to terrorize or put Healey in imminent fear of death and it was only the later posted comments that suggested a true intent to threaten harm.

Even if we were to assume that any differing views jurors possessed about the content of the terroristic threats were inconsequential, the fact that the judge's instructions allowed the jury to convict even when its members may have disagreed on which of the multiple theories was sustained poses too grave a risk that they were not unanimous on at least one of those theories.

Moreover, the jury was given the option of finding a violation of either subsection (a) or subsection (b). While the judge correctly instructed the jury in response to its question that only one theory needed to be found for a guilty verdict, he did not instruct that all jurors needed to agree on which provision was violated. The jury was not entitled to render a fragmented verdict in which

A-0913-19

one group found a violation of subsection (a) and another group, or even just a single juror, found only a violation of subsection (b). Without an instruction that would have made that clear to the jury, we can have no confidence that the jury did not produce an impermissibly fragmented verdict and we must, therefore, reverse and remand for a new trial.

* * *

The judgment under review is reversed. We remand for the dismissal of that part of the indictment that charges defendant with acting "in reckless disregard of the risk of causing such terror or inconvenience." N.J.S.A. 2C:12-3(a). We also remand for a new trial on the other charges contained in the indictment since we cannot know, from the way in which the case was presented to the jury, whether defendant was convicted for conduct that fell within those parts of N.J.S.A. 2C:12-3 that are not constitutionally overbroad and because the jury instructions did not ensure that the jury was unanimous on at least one part of the statute.

Reversed and remanded for a dismissal of part of the indictment and for a new trial on the rest in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION