NOT DESIGNATED FOR PUBLICATION

No. 121,504

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RYAN DAVID REYNOLDS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed June 17, 2022. Affirmed in part, reversed in part, and remanded with directions.

*Kai Tate Mann*, of Kansas Appellate Defender Officer, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., HURST, J., and PATRICK D. MCANANY, S.J.

PER CURIAM: A jury convicted Ryan David Reynolds of two counts of aggravated assault, two counts of criminal damage to property, one count of aggravated burglary, criminal threat, aggravated endangering a child, interference with law enforcement, and stalking. The district court sentenced Reynolds to 180 months' imprisonment followed by 36 months' postrelease supervision and ordered him to pay $529.77 in restitution. On appeal, Reynolds argues (1) his conviction for criminal threat requires reversal under *State v. Boettger*, 310 Kan. 800, 822, 450 P.3d 805 (2019); (2) the State failed to present sufficient evidence to support each of the various alternative means of aggravated

1

burglary; (3) the State failed to present sufficient evidence of each alternative means of aggravated endangering a child; (4) the aggravated burglary instruction was clearly erroneous; (5) cumulative error deprived him of his right to a fair trial; and (6) Kansas' restitution statutes violate both section 5 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution. This court finds that Reynolds' conviction for criminal threat must be reversed and remanded for further proceedings, but otherwise affirms his convictions and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

Ryan Reynolds married his wife, K.R., in 2011; they bought a house in 2012 and welcomed a daughter, E.R., shortly thereafter. Reynolds' behavior grew more erratic and violent over the years and K.R. moved out in April 2017 and eventually filed for divorce in July 2017. E.R. lived with K.R. during the separation and Reynolds had visitation. After moving out, K.R., who worked as a cosmetologist, continued to maintain her beauty salon in the remodeled bottom floor of the split-level home she had shared with Reynolds.

One example of Reynolds' aggressive behavior occurred on July 18, 2017, while K.R. was in the salon working and Reynolds repeatedly came down from the residential portion of the house to interrupt her. Reynolds had been served divorce papers the day before and wanted to discuss potential child support payments and K.R.'s request for maintenance. Reynolds, who was holding E.R. at the time, became frustrated because K.R. refused to talk while she was with her customer. After she finished with her client, K.R. attempted to leave with E.R., but Reynolds would not let them leave. Reynolds, while still holding E.R., punched a hole in the wall of the salon and according to K.R., threatened to kill her parents and burn down the house. Reynolds denied making this threat. K.R. eventually got E.R. away from Reynolds and tried to leave but he prevented

2

her from leaving when he tried to pull E.R. from the backseat and punched the back window of the car. A friend of K.R.'s called the police, and Reynolds got in his car and drove off but returned to the house by the time the police arrived.

About a month after this incident, K.R. was awarded possession of the house and residential custody of E.R. Reynolds received parenting time with E.R., but it did not include overnights. Soon after Reynolds moved out, K.R. filed a protection from abuse order—which she later dismissed because she did not want to "come across as whining."

Shortly thereafter, on October 19, 2017, police responded to K.R.'s house due to another incident involving Reynolds. While dropping E.R. off after a visit, Reynolds grew angry about a ring that he had purchased for K.R. and wanted back. K.R. refused to go outside and speak to Reynolds and then she heard several gunshots—although she did not see Reynolds fire a gun, she had no doubt it was him and feared for her life. K.R. later testified that Reynolds had previously threatened to kill her if she ever divorced him. Police later found numerous shell casings outside the house that matched Reynolds' handgun.

Reynolds' erratic and aggressive behavior came to a head in the early morning hours of November 4, 2017. The prior evening, Reynolds attempted to contact K.R. several times, and one of Reynolds' texts read: "Can you answer or I will come over." K.R. testified that she remembered being relieved that she was not at home with E.R. at that time. While on the way home, K.R.'s neighbor texted her that Reynolds had pulled into her driveway and then driven off. K.R. testified she was "freaked out" by this and picked up E.R. from her mother's and went home. That night, K.R.'s sister-in-law, L.R., spent the night on the couch in the living room.

At about 6 a.m. the next morning, K.R. heard a loud pounding on the front door. L.R. recognized Reynolds' voice yelling at the door and ran to K.R.'s room where they

locked themselves inside and immediately called 911. The pounding at the front door suddenly stopped as Reynolds went around the back of the house, up the porch steps, and banged on K.R.'s bedroom window, shouting at her not to call the police. Reynolds left the bedroom window and K.R. soon heard a loud "crashing downstairs," followed by footsteps coming up the stairs and into the residential floor of the house. K.R. testified that she recalled "[j]ust fearing for our safety. I mean, he's yelling, he's not—he's agitated, he's not normal, and I was—I remember moving out from in front of my bedroom door right before he kicked it in." The alarm system in the house notified K.R.'s mother of the break-in, and the alarm company called the police at K.R.'s mother's request.

Reynolds broke the lock and shattered the door frame as he entered K.R.'s bedroom. K.R. testified that Reynolds appeared completely out of control, and that she grabbed E.R. and held her tight. Reynolds drew his handgun, waved it around, and began "yelling crazy things about money and saving the world, and like, just being crazy. . . . And he just kept coming over and I think trying to grab for [E.R.]." Reynolds stood in front of the door, blocking the only way out of the small bedroom; both K.R. and L.R. testified they were terrified that Reynolds' gun might go off as he wildly waved it around the room. They recalled that Reynolds repeatedly dropped the magazine out of his handgun as he ranted at them. According to K.R., Reynolds was shouting "[a] lot of crazy things," that "[h]e didn't want us to leave . . . that he effing loved [E.R.]. . . ; yelling that he was there to hurt whoever was there. . . . He kept saying he was going to kill everyone. . . . including the police." Reynolds continued waving the gun around and repeatedly stated he was going to kill "everyone." K.R. and L.R. both testified that they feared for their safety.

K.R. had remained on the phone with 911 as Reynolds broke into her bedroom and threatened to kill the dispatcher. Around this time, K.R.'s mother began repeatedly calling her, and Reynolds eventually answered K.R.'s cellphone pretending to be a man named "Mario Lopez." K.R.'s mother immediately feared the worst, thinking Reynolds had

"probably killed them and they were gone." While Reynolds never specifically said that he was going to kill K.R., he repeatedly yelled that he was going to kill "everyone"—and K.R. believed he meant he was going to kill everyone in the house. However, K.R. later clarified that she did not think Reynolds would have shot them on purpose, "[b]ut out of carelessness, and how crazy he was, it could've easily happened."

About 13 minutes after Reynolds broke down K.R.'s bedroom door, K.R, E.R., and L.R. managed to escape. K.R. later explained that Reynolds was standing in front of the door with the gun and she did not feel safe trying to escape the room any earlier. As they got out of the house, Reynolds followed them across the lawn and over to a neighbor's home. K.R. could not tell if the police had arrived when they made it outside, but an officer saw them enter the neighbor's house where they hid until police arrived.

Numerous police eventually arrived at the scene as Reynolds got into his car with his dog and attempted to back out of the driveway. The police blocked him in the driveway, and one officer noted that Reynolds was "[e]xtremely agitated, very animated, almost to a point I would say out of control." Reynolds yelled at the officers, and refused to turn the car off or get out and surrender. Officers later discovered Reynolds still had his loaded handgun with him in the car, although officers never stated that Reynolds brandished it at them. During the standoff, Reynolds shouted at the officers about the Mexican Mafia, saying they were after his family and telling the officers that he was going to kill anyone who would hurt his family, and accused the officers of covering for the Mexican Mafia. In all, it took about 2 hours, 16 police officers, and a SWAT team to get Reynolds out of his vehicle.

Based on these events, the State charged Reynolds with
- three counts of kidnapping;
- aggravated burglary;
- aggravated intimidation of a witness;

5

- two counts of aggravated assault;

- criminal threat;

- aggravated endangering a child;

- interference with law enforcement;

- stalking; and

- two counts of criminal damage to property.

Reynolds proceeded to trial, where he testified in his own defense. On the stand, Reynolds explained that he had become involved with dangerous people and he believed he had upset members of the Mexican Mafia and that his family was in danger. According to Reynolds, he was simply checking on his family to ensure their safety. Just hours before arriving at K.R.'s house, Reynolds had an encounter with his mother where she said that he appeared to be drunk and high—Reynolds admitted at trial that he was under the influence. Reynolds waved his gun around and told his mother that people were trying to hurt her, and after inspecting her apartment and finding no one he went to K.R.'s house to check on her and E.R.

Reynolds testified that when he arrived at K.R.'s house he assumed K.R. and his daughter were being held hostage, but he did not call 911 because he feared for their safety. Reynolds denied telling K.R. not to call the police. Reynolds admitted to breaking down the door to K.R.'s salon to enter the house but testified that he told K.R., "I'm here to save you." Neither K.R. nor L.R. recalled Reynolds stating that he was there to protect them or even asking if they were alright—but both women remembered him ranting about people being in the house. While Reynolds admitted to breaking into the home and pulling out his gun after entering K.R.'s bedroom, he flatly denied threatening K.R. or keeping anyone trapped and claimed that he only intended to harm the people he thought were after his family. Reynolds further explained that he threatened to kill the 911 dispatcher because "I didn't believe that that was 911. . . . She said her last name was

6

Lopez. I think the Mexican Mafia was after my family, and that enhanced everything."
He did not dispute that his refusal to comply with police orders led to the two-hour
standoff.

After receiving all the evidence, the jury found Reynolds guilty of

- aggravated burglary;
- two counts of aggravated assault;
- criminal threat;
- aggravated endangering a child;
- interference with law enforcement;
- stalking; and
- two counts of criminal damage to property.

The jury found him not guilty of both aggravated intimidation of a victim and
kidnapping. The district court found Reynolds' criminal history score to be A and
sentenced him to 180 months' imprisonment, followed by 36 months' postrelease
supervision. The court further ordered Reynolds to pay $529.77 in restitution, which
included repayment for the damages he caused to K.R.'s house. Reynolds appeals.

DISCUSSION

1. *Reynolds' conviction for criminal threat must be reversed.*

Reynolds first argues that his criminal threat conviction must be reversed given the
Kansas Supreme Court holding in *Boettger*, 310 Kan. at 822 (holding the reckless
disregard portion of the criminal threat statute to be unconstitutionally overbroad).
Reynolds asserts that the record is insufficient to establish whether the jury unanimously
found him guilty of the intentional or reckless version of the crime. The State concedes

7

that Reynolds' conviction for reckless criminal threat is unconstitutionally overbroad but claims that any error in instructing the jury on both the reckless and intentional theories of criminal threat was harmless because the record plainly supports that Reynolds acted intentionally. To prevail, the State bears the burden to establish beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial given the entire record, i.e., that there is no reasonable possibility that the error contributed to the verdict. See *State v. Johnson*, 310 Kan. 835, 843, 450 P.3d 790 (2019), *cert. denied* 140 S. Ct. 1956 (2020) (applying constitutional harmlessness test when jury received instructions on both reckless and intentional criminal threat).

The State charged Reynolds with criminal threat under K.S.A. 2017 Supp. 21-5415(a)(1), alleging he had "unlawfully, feloniously, and knowingly, communicate[d] a threat to commit violence, *with the intent to place another in fear or in reckless disregard of the risk of causing such fear*." (Emphasis added.) The jury instruction for the charge similarly stated:

> "To establish this charge, each of the following claims must be proved:
> "1. The defendant threatened to commit violence and communicated the threat with the intent to place another in fear or threatened to commit violence and communicated the threat with reckless disregard of the risk of causing fear in another.
> "2. This act occurred on or about the 4th day of November, 2017, in Shawnee County, Kansas."

In *Boettger*, the Kansas Supreme Court found the "reckless disregard" portion of the 2018 version of the criminal threat statute unconstitutionally overbroad because it could potentially punish constitutionally protected speech. 310 Kan. at 822-23. The statutory language supporting Reynolds' criminal threat conviction and the language found unconstitutional in *Boettger* are the same. Compare K.S.A. 2017 Supp. 21-5415(a)(1) with K.S.A. 2018 Supp. 21-5415(a)(1). Because this unconstitutional

language was included in Reynolds' criminal threat charge and the jury instructions for his conviction, the issue is whether this error is harmless. See *Johnson*, 310 Kan at 843.

In *Johnson*, similar to this case, the State charged the defendant with intentionally *or* recklessly making a criminal threat, instructed the jury on both mental states, and did not require the jury to unanimously determine whether the defendant was guilty of an intentional or reckless mental state. Ultimately, the *Johnson* court reversed the conviction and remanded for a new trial, finding the State could not show there was "no reasonable possibility" that the error contributed to the guilty verdict. 310 Kan. at 843. The *Johnson* court relied on four considerations:

(1) the district court instructed the jury on both the intentional and reckless forms of criminal threat, accurately reciting the statutory definitions of both;
(2) neither the State nor the jury instructions steered the jury toward convicting the defendant based solely on one mental state or the other;
(3) the district court did not instruct the jury to unanimously agree on one of the mental states; and
(4) the verdict form did not require a specific finding of either of the alternative means. 310 Kan. at 843.

Finally, the *Johnson* court noted that based on the evidence, it would have been reasonable for the jury to find the crime had been committed either intentionally or recklessly. 310 Kan. at 844. The Kansas Supreme Court has since applied this analytical framework to similar facts and reached the same result. See *State v. Lindemuth*, 312 Kan. 12, 17-19, 470 P.3d 1279 (2020). Accordingly, this court examines Reynolds' claim under the same framework.

First, as in *Johnson* and *Lindemuth*, the district court instructed the jury on both forms of criminal threat and provided the statutory definitions of "intentionally" and

9

"recklessly." Second, neither the jury instructions nor the State's arguments steered the jury toward convicting Reynolds based solely on one mental state or the other. In fact, in the jury instructions, opening statement, and closing statement the State continued to provide both alternative means for the criminal threat charge and simply explained the threat without asking the jury to find one way or the other.   The State even emphasized that the jury could find Reynolds guilty of the crime if he had *either* mental state:

> "The State must prove the defendant committed the crime intentionally or recklessly. This is where this instruction is a little different. *You could find that it was his desire to communicate that threat; or you can find that he recklessly did it.* And when a defendant acts recklessly, when he consciously disregards a substantial and unjustifiable risk that certain circumstances exist or a result of the defendant's actions will follow. . . . *You can find either it was his desire to do that or he acted recklessly in doing that*." (Emphases added.)

Third, although the district court gave the jury an unanimity instruction, it did not instruct the jury that it had to agree unanimously on whether Reynolds acted intentionally or recklessly. The jury instruction simply read:  "Your agreement upon a verdict must be unanimous." Fourth, the verdict form did not require the jury to make a specific finding of one mental state or the other. It simply asked the presiding juror to sign stating either "We, the jury, find the defendant guilty of the crime of Criminal Threat as charged in Count 8," or "We, the jury, find the defendant not guilty of Criminal Threat." Finally, based on the evidence, it is reasonable that the jury could have believed Reynolds made his statements with reckless disregard for whether they caused K.R. or L.R fear. While it would have been reasonable for a jury to find that Reynolds intended to place K.R., E.R., or L.R. in fear by waving his gun around and saying he was going to kill everyone, the evidence also supports that Reynolds acted recklessly. Reynolds testified that his actions were intended to protect his family and K.R. testified that Reynolds was acting erratically, but she did not believe he intended to shoot her.

Given the circumstances, the jury could have reasonably found Reynolds' statements to be reckless, i.e., a threat "simply spoke[n] in the heat of argument and the result of unthinking rage," rather than intentional. *Lindemuth*, 312 Kan. at 18; see *State v. Stevenson*, 59 Kan. App. 2d 49, 63-64, 478 P.3d 781 (2020) ("talking shit" and "venting" as possible impulsive bluster which undermined the conclusion the jury unanimously found defendant guilty of intentional criminal threat), *rev. denied* 313 Kan. 1045 (2021). A reasonable person could have believed Reynolds' testimony that he sought to protect his family and recklessly disregarded that his actions were causing fear in K.R., L.R., and E.R. with his erratic, agitated, and hostile behavior, and did not make any threats that he intended to cause such fear.

As in *Johnson* and *Lindemuth*, the trial record here provides no basis for this court to determine if the jury concluded beyond a reasonable doubt that Reynolds committed the crime of criminal threat intentionally or recklessly. The State charged Reynolds with both forms and the jury instructions presented alternative mental states for the crime without requiring unanimity, and the State argued both mental states in its closing argument and told the jury that either was sufficient. Additionally, the evidence at trial could have supported a conviction for criminal threat under either mental state. Although the jury unanimously found Reynolds guilty of criminal threat—as charged and instructed—there is no indication which alternative mental state the jury found him guilty of. Because the State cannot meet its burden to show there is no reasonable possibility the error contributed to the verdict, this court reverses Reynolds' conviction for criminal threat and remands the case to the district court for further proceedings.

2. *Substantial evidence supports each of the alternative means of committing aggravated burglary that were charged by the State.*

Next, Reynolds argues his conviction for aggravated burglary must be reversed because the evidence was insufficient to support each of the alternative means on which the jury was instructed.

Reynolds focuses his argument on three separate "bundles of alternative means" included in the aggravated burglary charge.

He contends that two alternative means are presented in the first element of the aggravated burglary charge: first, that he "entered into or remained" within the structure. Then, three alternative means are presented in the intent element because it has three potential underlying crimes of intent to commit: kidnapping, aggravated assault, or criminal threat. And last, two more alternative means in the final element: that the structure he "entered into or remained" within was either a "building or a dwelling."

To succeed on any of these claims, Reynolds must demonstrate that the various theories presented to the jury were in fact alternative means of committing aggravated burglary and that there was insufficient evidence to support at least one of those means. See *State v. Cottrell*, 310 Kan. 150, 157, 445 P.3d 1132 (2019) ("In 'an alternative means case, . . . sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt.'"); *State v. Rucker*, 309 Kan. 1090, 1094, 441 P.3d 1053 (2019). If there is insufficient evidence "to support the defendant's conviction of each alternative means of committing a crime, the proper remedy is to reverse the defendant's conviction and remand for a new trial only on the alternative means supported by sufficient evidence in the first trial." *State v. Shay*, 56 Kan. App. 2d 721, Syl. ¶ 3, 437 P.3d 78 (2019).

To resolve this matter, this court first examines the statutory language defining the material elements of the crime of aggravated burglary. See *State v. Brown*, 295 Kan. 181, 200, 284 P.3d 977 (2012). "Issues of statutory interpretation and construction, including

12

issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal." 295 Kan. at 193-94. If a statute does present an alternative means problem, this court must conduct a "super-sufficiency" analysis. The super-sufficiency analysis requires this court to determine whether sufficient evidence supports each of the alternative means charged to ensure that the verdict was unanimous as to guilt. *State v. Butler*, 307 Kan. 831, 841, 416 P.3d 116 (2018).

### a. *The first bundle: Reynolds entered into or remained within*

The Kansas Supreme Court has held that "entering into" or "remaining within" are alternative means of committing aggravated burglary, and this court must follow that determination. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016); see *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Aggravated burglary requires a human being's presence in a structure. The crime can be committed either by "entering into" or "remaining within" that structure—which are two legally distinct factual scenarios. Because the Kansas Supreme Court has held "entering into" and "remaining within" are alternative means, this court must determine whether the jury heard sufficient evidence to support both. "The entering into element is satisfied when the evidence shows a defendant crossed the plane of a building's exterior wall. In contrast, the remaining within element refers to a defendant's presence in the building's interior after entry has occurred." *Daws*, 303 Kan. at 789.

Here, the State produced ample evidence to prove both alternative means. After banging on the front door and K.R.'s bedroom window, Reynolds went to the salon door around the back of the house, broke it down, and entered the house. The evidence further supports the "remaining within" means of committing aggravated burglary because after Reynolds broke into the house, he proceeded up the stairs and into K.R.'s bedroom, where he proceeded to wave his gun around, yelled at K.R., L.R., and E.R., and repeatedly said he would kill "everyone." Reynolds stayed inside the house, and also

blocked the bedroom doorway for about 13 minutes. These acts plainly and sufficiently support a finding that Reynolds entered into and remained within K.R.'s house and the State presented sufficient evidence to support both alternative means.

b.  *The second bundle: Reynolds' intent to commit kidnapping, aggravated assault, or criminal threat*

Reynolds next argues that instructing the jury on three different felonies that he intended to commit created three alternative means of committing aggravated burglary. The State disagrees and contends that the three specified felonies are merely options within a means—that is, the underlying felony is immaterial and "[a]ny felony will do."

"[A]lternative means can be based on variations in mens rea, as well as in actus reus, or in a statutorily required causation element." *Brown*, 295 Kan. at 191. However, "[i]dentifying an alternative means statute is more complicated than spotting the word 'or.'" 295 Kan. at 193. Here, the State chose to submit three distinct felonies to the jury for the intent element of aggravated burglary and thus created an alternative means issue. Rather than merely describing a material element or a factual circumstance that would prove the crime, the State was required to provide sufficient evidence that Reynolds intended to commit kidnapping, aggravated assault, or criminal threat when he entered K.R.'s house. See e.g., *State v. Brown*, 299 Kan. 1021, 1036, 327 P.3d 1002 (2014), *disapproved of on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Ross*, No. 118,199, 2019 WL 847672, at \*16-18 (Kan. App. 2019) (unpublished opinion); *State v. Darnell*, No. 115,193, 2017 WL 4848792, at \*2-4 (Kan. App. 2017) (unpublished opinion). In *Brown*, the Kansas Supreme Court noted, without engaging in any analysis, that "[t]he information's charge of aggravated burglary *contained three alternative means* for committing the underlying felony: aggravated battery, aggravated assault, and/or murder in the first degree." (Emphasis added.) See 299 Kan. at 1036.

Thus, this court assumes, without deciding, that whether Reynolds intended to commit each of the underlying felonies listed created alternative means of committing the crime.

Reynolds argues the State failed to present sufficient evidence that he had the intent to commit all three of the underlying crimes that constituted alterative means. In reviewing this challenge, this court reviews all the evidence in a light more favorable to the State and must determine whether a rational fact-finder could have found each means of committing the crime proved beyond a reasonable doubt. In making this determination, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *Butler*, 307 Kan. at 844-45. Additionally, the State need not have produced sufficient evidence to establish Reynolds' guilt of each of the three alternative means—but rather, only that he had intended to commit each of the crimes.

During the instructions conference, the State requested the court include all three crimes in the final instruction, and the district court agreed that there was evidence to support each underlying felony. In what makes for an interesting twist, the jury convicted Reynolds of two counts of aggravated assault and one count of criminal threat, but it found him *not guilty* of both the kidnapping and the lesser-included offense of criminal restraint. Additionally, as explained above, this court is required to reverse Reynolds' criminal threat conviction. Therefore, Reynolds contends there was insufficient evidence to support the alternative means of intent to commit kidnapping and criminal threat; he does not dispute there was ample evidence of his intent to commit aggravated assault. Although factually interesting, Reynolds' argument lacks legal authority or significance.

This court is merely charged with determining if sufficient evidence exists such that a rational fact-finder *could have* found Reynolds guilty of intent to kidnap and intent to commit intentional criminal threat—not whether he was in fact found guilty beyond a reasonable doubt. See *Butler*, 307 Kan. at 844-45. Although the jury ultimately did not

15

find Reynolds guilty of kidnapping, a rational fact-finder could nonetheless have found that he entered K.R.'s residence with an intent to commit that crime.

Kidnapping is defined as "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person: . . . to facilitate flight or the commission of any crime." K.S.A. 2021 Supp. 21-5408. After entering the home, Reynolds stormed up the stairs, broke down K.R.'s bedroom door, and trapped K.R., E.R., and L.R. in the bedroom. While Reynolds explained that his motives were solely to protect his wife and daughter, his actions could have supported a finding that he intended to commit a kidnapping, even if a jury found that he never completed the kidnapping. Reynolds shouted at K.R. not to call the police and once inside her bedroom did not call for help but rather yelled and waved a gun around while standing in the doorway and taking actions that prevented the women and child from leaving the bedroom. In sum, the State presented sufficient evidence from which a rational fact-finder could find beyond a reasonable doubt that Reynolds at the very least *intended* to commit a kidnapping—even if he did not ultimately do so. Moreover, while this court reverses Reynolds' criminal threat conviction for the reasons explained above, there is nevertheless sufficient evidence to support that Reynolds likewise had the *intent* to commit intentional criminal threat when he entered into and remained within the house.

In arguing there was insufficient evidence to show that he had any intent to commit these underlying crimes, Reynolds neglects to address the critical difference between this court's standard of review on appeal and the State's burden of proof at trial. When viewed in a light more favorable to the State, a rational factfinder could have found Reynolds guilty beyond a reasonable doubt that he entered K.R.'s house with the intent to commit kidnapping, criminal threat, and aggravated assault.

c.      *The third bundle:  Building or a dwelling*

Finally, Reynolds contends that that nature of K.R.'s house—whether it is a building or a dwelling—created another alternative means issue. Again, he asserts the State did not provide sufficient evidence to support both types of structure. As with the other elements, the first question is whether this portion of the statute provides alternative means for conviction which is a question of law subject to unlimited review. *Brown*, 295 Kan. at 193-94. If a statute lists alternative, distinct material elements and they are incorporated into an instruction—an alternative means issue arises. However, if a statute merely describes a material element or factual circumstance that would prove the crime, this does not create alternative means, even if the description is included in a jury instruction. 295 Kan. at 194, 200. Here, the terms "building" and "dwelling" in K.S.A. 2021 Supp. 21-5807(b)(1)-(2) do not present alternative means of aggravated burglary, but rather describe a factual circumstance that may prove a material element of the crime—that a defendant made unauthorized entry into *a structure* that another person was inside of. Regardless of whether it is a dwelling or a building, a *structure* is the material element of the crime. The various structures listed under the statute are options within a means, not alternative means. 295 Kan. at 197 ("An option within a means scenario is another important clue to legislative intent because such options signal secondary status rather than an intent to create a material, distinct element of the crime."). Because the inclusion of "building or dwelling" did not create alternative means, this court need not examine the sufficiency of the evidence to address Reynolds' concerns about jury unanimity.

3. *Substantial evidence supports Reynolds' conviction for aggravated child endangerment.*

Reynolds raises another alternative means argument regarding his conviction for aggravated endangerment of a child. Reynolds contends that the State failed to present

17

sufficient evidence that he recklessly *caused or permitted* E.R. to be placed in a situation in which her life, body, or health was endangered. During the jury instruction conference, the district court determined that the aggravated child endangerment charge should have the language "or permitted" stricken from the instruction. But when the court orally instructed the jury, it said that the State had to prove that Reynolds "recklessly caused or permitted E.R.R. to be placed in a situation in which E.R.R.'s life, body, or health was endangered." The court later clarified that it had made this mistake in the oral recitation of the jury instruction Number 20. The written instruction given to the jury did not include the "to permit" language for the aggravated child endangerment charge and only included the language that the State was required to prove Reynolds "recklessly caused E.R.R. to be placed in a situation in which E.R.R.'s life, body or health was endangered."

Just as with all of Reynolds' other alternative means claims, he must demonstrate that (1) "caused or permitted" constitute alternative means of committing aggravated child endangerment; and (2) there was insufficient evidence to support one of those means. See *Cottrell*, 310 Kan. at 157. This court exercises unlimited review over the question of whether the statutory language presents an issue of alternative means of committing aggravated child endangerment. See *Butler*, 307 Kan. at 841 ("[W]e must initially consider whether the jury was ever presented with an alternative means case."); *Brown*, 295 Kan. at 193-94.

As of this writing, the Kansas Supreme Court has not ruled on whether "caused or permitted" constitutes alternative means of proving child endangerment, but it has peripherally touched on the issue. In *State v. Jones*, 295 Kan. 1050, 288 P.3d 140 (2012), the court explained:

> "a traditional alternative means argument would go something like this:  The defendant
> could have been convicted of one incident of endangering a child by either *causing* the

18

child to be placed in a dangerous situation or by *permitting* the child to be placed in that circumstance, and there was evidence of only one of the means." 295 Kan. at 1058-59.

Reynolds contends that by this statement the Kansas Supreme Court has held that "caused or permitted" do in fact constitute alternative means for committing aggravated child endangerment. However, Reynolds misreads the court's example of an argument Jones could have made for a statement that the argument would have prevailed. The court was merely distinguishing Jones' "curious, albeit creative, alternative means argument" that three separate factual incidents constituted alternative means with a hypothetical, "traditional alternative means argument" that a defendant might make under the circumstances—but it did not analyze or decide that hypothetical argument. 295 Kan. at 1058-59. Moreover, a recent panel of this court did analyze that hypothetical argument and concluded that "the statutory language 'causing or permitting' does not present two alternative means of committing the crime of aggravated endangerment of a child." *State v. Mulloy*, No. 120,539, 2020 WL 1223509, at *6 (Kan. App.) (unpublished opinion) *rev. denied* 312 Kan. 899 (2020). This court finds the reasoning of the *Mulloy* panel sound and finds no reason to conclude differently.

The question of whether the Legislature intended to create alternative means of committing a crime looks to whether the statute lists separate or distinct mens rea, actus reus, or causation elements. *Brown*, 295 Kan. at 195. As explained by the *Mulloy* panel, "the phrase 'causing or permitting' merely describes a factual circumstance that may prove a distinct, material element of aggravated child endangerment—namely, placing a child in a situation in which the child's life, body, or health was endangered." 2020 WL 1223509, at *6. The actus reus of the offense "is to place a child in a dangerous situation and the phrase 'causing or permitting' merely describes this material element." 2020 WL 1223509, at *6; see *Brown*, 295 Kan. at 196-97. Accordingly, the phrase "causing or permitting" in the aggravated endangering of a child statute does not constitute alternative means of placing a child in danger and the judge's inclusion of the language

19

did not create a jury unanimity issue. Even if these elements of aggravated child endangerment did constitute alternative means, there was sufficient evidence here to support that Reynolds both caused and permitted his daughter to be placed in a dangerous situation. Reynolds' alternative means argument fails and there was sufficient evidence for the jury to find him guilty of aggravated child endangerment.

4. *The jury instruction for aggravated burglary was not clearly erroneous.*

Reynolds next claims that the aggravated burglary jury instruction was clearly erroneous because it was overbroad, containing statutory language that was not included in the charging document. Specifically, Reynolds argues that the jury was instructed on a theory of aggravated burglary that included a "dwelling," and was therefore broader than the narrow language of the charging document, which only included a "building, motor vehicle, or other means of conveyance." This court follows a three-step process when analyzing jury instructions for error: (1) whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) whether an error occurred; and (3) if an error occurred, whether it requires reversal. *State v. Crosby*, 312 Kan. 630, 638, 479 P.3d 167 (2021).

As to the first step, Reynolds concedes that he did not object to the aggravated burglary instruction at trial. When a party fails to object to an allegedly erroneous jury instruction, this court applies a clear error standard to its review—determining "whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *State v. Jones*, 313 Kan. 917, 927, 492 P.3d 433 (2021) (quoting *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 [2018]); see K.S.A. 2021 Supp. 22-3414(3). This court reviews the record de novo to determine if Reynolds met his burden to show the instruction was clearly erroneous. *Jones*, 313 Kan. at 927.

20

However, before examining reversibility this court must first determine whether the aggravated burglary instruction was legally and factually appropriate. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). The charging document "sets out the specific offense alleged to inform the defendant of the nature of the accusation, to permit the development of a defense to meet that accusation, and to protect against conviction based on facts not contemplated in the accusation." *State v. McClelland*, 301 Kan. 815, Syl. ¶ 4, 347 P.3d 211 (2015). Accordingly, the State is bound by the charging document, and a jury instruction that includes elements that are broader than those included in the charging document is erroneous. 301 Kan. 815, Syl. ¶ 4. If a jury instruction adds alternate statutory elements that were not contained within the charging document, the instruction is overly broad. *Crosby*, 312 Kan. at 639.

The charging document contained the following in support of Reynolds' aggravated burglary charge:

"On or about the 4th day of November, 2017 in the State of Kansas and County of Shawnee, RYAN DAVID REYNOLDS, did, then and there, unlawfully, feloniously, and without authority, enter into or remain *within a building, motor vehicle, or other means of conveyance*, to-wit: [address], in which there is a human being, to-wit: [K.R.] and/or [L.R.] and/or E.R.R. xx/xx/15, with the intent to commit a felony therein." (Emphasis added.)

At trial, the jury instruction on aggravated burglary stated:

"To establish this charge, each of the following claims must be proved:
"1. The defendant entered into or remained *in a building or dwelling.*
"2. The defendant did so without authority.
"3. The defendant did so with the intent to commit kidnapping, aggravated assault or criminal threat therein,
"4. At the time there was a human being in the building or dwelling.

21

"5. This act occurred on or about the 4th day of November, 2017, in Shawnee County, Kansas." (Emphasis added.)

Reynolds claims the jury instruction was legally inappropriate because it was broader than the crime charged in the indictment because it included the word "dwelling." It is true that the charging document language appears to correspond to K.S.A. 2017 Supp. 21-5807(b)(2), (b)(3), but, as the State notes, it further lists the offense as "a severity level 4, person felony"—which instead corresponds to K.S.A. 2017 Supp. 21-5807(b)(1). The State claims this is "more akin to an issue of an insufficient charging document rather than an erroneous jury instruction issue." Regardless, Reynolds is correct that the jury instructions included alternative statutory language—the word "dwelling"—that was not included within the charging document. See, e.g., *State v. Hart*, 297 Kan. 494, 508, 301 P.3d 1279 (2013) (finding overbroad instruction for indecent liberties charge where complaint only alleged intent to satisfy the sexual desires of the defendant and instruction listed the intent to arouse the sexual desires of the victim or defendant or both); *State v. Trautloff*, 289 Kan. 793, 803, 217 P.3d 15 (2009) (finding overbreadth where the jury instruction allowed the jury to convict the defendant of "displaying or procuring or producing" explicit photographs or videos of a child but the State only charged defendant with "displaying" such videos).

Although the aggravated burglary instruction added statutory language not included in the charging documents, such addition does not raise any of the traditional concerns associated with an overbroad jury instruction. See *Hart*, 297 Kan. at 508; *Trautloff*, 289 Kan. at 802-03. Reynolds was informed of the nature of the offense he was alleged to have committed, and any distinction between a "building" and "dwelling" does not impact Reynolds' defense. He was plainly aware of the charges against him as the address of the location he was accused of burgling was included in the charging document. The addition of the word "dwelling" to the jury instruction did not hamper his ability to present a defense nor did it lure or trick him into presenting a defense related to

22

an alternate theory of the crime. The word "dwelling" is merely a more specific type of "building" and its addition did not lead to a conviction based on facts not contemplated by the charging document.

Assuming, without deciding, that the aggravated burglary instruction was in fact overbroad such as to constitute an error—Reynolds cannot show that the error was clearly erroneous. This court is not firmly convinced that the jury would have reached a different verdict had the jury instruction only included the word building and not the word dwelling. *Hart*, 297 Kan. at 508. There is no evidence that Reynolds suffered a "'trial by ambush'" based on the inclusion of a description for the burgled structure in the jury instruction. See 297 Kan. at 510. Accordingly, this court finds that even if the instruction were overboard, it would not require reversal under the clear error standard.

5. *Cumulative error did not deprive Reynolds of his right to a fair trial.*

Finally, Reynolds asserts that the cumulative impact of the numerous alleged errors prejudiced his right to a fair trial and that all of his convictions must be reversed. In assessing the cumulative effect of errors, this court examines the errors in the context of the entire record, analyzing any remedial measures taken as the errors arose, the nature and number of errors, their interrelatedness, and the overall strength of the evidence. *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019). If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017). However, there is no prejudicial cumulative error when the evidence against the defendant is overwhelming. *State v. Cosby*, 285 Kan. 230, Syl. ¶ 9, 169 P.3d 1128 (2007). Additionally, as its name suggests, there can be no cumulative error when, as here, only one error supports reversal. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

Despite his efforts, Reynolds only identified one trial error of his criminal threat conviction—and this court's reversal of that conviction cures that error. See *State v. King*, 297 Kan. 955, 987, 305 P.3d 641 (2013) (refusing to weigh impact of instructional, multiplicity errors already cured through reversal of affected convictions). This court cannot imagine any direct, or even negligible indirect, impact of this single error on Reynolds' numerous other convictions, particularly given the copious evidence supporting those convictions. Because Reynolds has only established one error there is nothing for this court to accumulate—the cumulative error doctrine does not require reversal of Reynolds' convictions.

6. *Reynolds' constitutional challenges to Kansas' restitution statutes do not afford him relief.*

For the first time on appeal, Reynolds raises two constitutional challenges to the district court's $529.77 restitution order. First, he contends Kansas' restitution statutes violate section 5 of the Kansas Constitution Bill of Rights because they encroach upon a criminal defendant's common law right to a civil jury trial on damages caused by the defendant's crime. Second, he argues that Kansas' restitution statutes violate his Sixth Amendment jury trial right because the statutes allow the court to make a finding of fact that increased the penalty for his crime beyond the prescribed statutory maximum. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Although Reynolds did not raise these constitutional claims before the district court, this court may reach the merits of his unpreserved arguments because the right to a jury trial is a fundamental right under both section 5 of the Kansas Constitution Bill of Rights and the Sixth Amendment to the United States Constitution. *State v. Rizo*, 304 Kan. 974, 979-80, 377 P.3d 419 (2016).

Although this court may address these unpreserved claims—such does not save Reynolds' claims because they both fail under the recently decided cases of *State v.*

*Robison*, 314 Kan. 245, 496 P.3d 892 (2021), *petition for cert. filed* February 11, 2022, and *State v. Arnett*, 314 Kan. 183, 496 P.3d 928 (2021), *petition for cert. filed* February 11, 2022. In these cases, the Kansas Supreme Court addressed arguments identical to Reynolds' claims here and found that the current Kansas criminal restitution statutes do not trigger Sixth Amendment protections as contemplated by *Apprendi* and its progeny. *Robison*, 314 Kan. at 249-51; *Arnett*, 314 Kan. at 186-88. Meanwhile, the Kansas Supreme Court has found that the present statutory restitution scheme violates section 5 of the Kansas Constitution by converting restitution orders into civil judgments— effectively bypassing the traditional function of juries to determine civil damages. *Arnett*, 314 Kan. at 189-93. However, the *Arnett* court concluded the proper remedy was to sever the offending portions of the statutory scheme, not to vacate every restitution order. Although Kansas restitution statues implicate section 5, the severance of the unconstitutional provisions render Reynolds' restitution judgment constitutionally valid. *Arnett*, 314 Kan. at 194-96; *State v. Owens*, 314 Kan. 210, 242-44, 496 P.3d 902 (2021).

This court is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). There is no reason to suggest such a departure from this precedent considering the recency of the Kansas Supreme Court's decisions on these issues. Accordingly, Reynolds' constitutional claims fail.

CONCLUSION

Reynolds' conviction for criminal threat is reversed because there is insufficient evidence that his conviction was not based on the reckless disregard portion of the statute that has since been found unconstitutional. Thus, this court remands this issue to the district court for further proceedings. But this court is unpersuaded by any of Reynolds' remaining claims and affirms his remaining convictions and sentence.

25

Affirmed in part, reversed in part, and remanded with directions.